191 F.3d 719 (6th Cir. 1999)
 Charles Kincaid, individually and on behalf of all others similarly situated, and Capri Coffer, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
Betty Gibson, individually and in her official capacity as Vice President of Student Affairs of Kentucky State University; Mary Smith, individually and in her official capacity as President of Kentucky State University; Dr. William Parker, George H. Helton, Robert E. Ison, Valinda E. Livingston, Veleria Shavers, Dr. Richard Taylor, Michele C. Coleman, M. Anthony Howard, Joyce Ann Johnson, Dr. Anthony T. Remson, and Curtis D. Sullivan, all individually and in their official capacities as Regents of Kentucky State University, Defendants-Appellees.
 No. 98-5385
 UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT
 Argued: March 18, 1999
Decided and Filed: September 8, 1999
 
 Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort; No. 95-00098--Joseph M. Hood, District Judge.[Copyrighted Material Omitted]
 Winter R. Huff, Law Offices of John G. Prather, D. Bruce Orwin, Somerset, Kentucky, for Appellants.
 Richard M. Goehler, Frost & Jacobs, LLP, Cincinnati, OH, for Student Press Law Center.
 Ann K. Benfield, Louisville, Kentucky, for American Civil Liberties Union, American Civil Liberties Union of Kentucky, American Association of University Professors, The Thomas Jefferson Center for the Protection of Free Expression, Nation Campaign for the the Freedom of Expression, National Coalition Against Censorship and National Council of Teachers of English.
 Lucy A. Dalglish, DORSEY & WHITNEY, LLP, Minneapolis, Minnesota, for the Society of Professional Journalists, The American Society of Newspaper Editors and The Reporters Committee for Freedom of the Press and the National Federation of Press Women.
 J. Guthrie True, JOHNSON, JUDY, TRUE & GUARNIERI, Frankfort, Kentucky, for Appellees.
 Before: RYAN, NORRIS, and COLE, Circuit Judges.
 NORRIS, J., delivered the opinion of the court, in which RYAN, J., joined. COLE, J. (pp. 730-32), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Plaintiffs Charles Kincaid and Capri Coffer challenge Kentucky State University ("KSU") officials' ban on the distribution of KSU's 1992-94 yearbook and the officials' alleged attempt to influence the content of the school newspaper. Plaintiffs appeal the district court's grant of defendants' motions to dismiss and for summary judgment. We affirm the judgment of the district court.
 
 I.
 
 2
 Charles Kincaid is currently a student at Kentucky State University. During the occurrence of the events underlying this action, Kincaid was a consumer of and contributor to The Thorobred News, the KSU student newspaper, and purchased The Thorobred yearbook at issue. Capri Coffer was at all relevant times a KSU student, a staff writer for, and consumer of, the student newspaper, and an editor and purchaser of the yearbook.
 
 
 3
 KSU is a state-funded public university. The KSU student newspaper and yearbook are operated on, and by means of, KSU property and are funded by the university, the yearbook at least partially by some portion of a mandatory $80.00 student activities fee. Payment of this fee entitles a student to a copy of the yearbook. Both publications are subject to oversight by the Student Publications Board, on which sits (among others) the editors of the newspaper and yearbook, the Vice-President for Student Affairs, and the Student Publications Coordinator. The Board's functions are to select the editors and staff for each of the student publications, arrange seminars for journalism education, provide the publications with counsel, and approve the written publications policy of each student publication, including such items as purpose, size, quantity controls, and time, place, and manner of distribution.
 
 
 4
 At the time of the events giving rise to this action, the Student Publications Board had not yet adopted a governing policy detailing the scope of its oversight of student publications.[1] The only written indication of the University's intent in this regard may be found in the KSU student handbook, under a section entitled "Student Publications."
 
 
 5
 The Board of Regents respects the integrity of student publications and the press, and the rights to exist in an atmosphere of free and responsible discussion and of intellectual exploration. The Board expects student editors and faculty advisors to adhere to high standards of journalistic ethics and the highest level of good taste and maturity in the integrity, tone and content of student publications.
 
 Student Publications Board
 
 6
 The Thorobred News (Student Newspaper) and the Thorobred yearbook shall be under the management of the Student Publications Board. Though both publications are subsidized by the University, it is the intent that both shall be as free of censorship as prevailing law dictates.
 
 The Student Publications Board shall:
 
 7
 1. Approve the written publications policy of each student publication, including such items as purpose, size, quantity controls, and time, place and manner of distribution;
 
 
 8
 2. Set qualifications for and (upon nomination by the Student Publications Advisor), appoint the editor of each publication who shall serve for a one-year term, unless reappointed or removed by the Board for cause;
 
 
 9
 3. Set qualifications for and appoint staff members for each publication upon nomination of its editor with concurrence of the Student Publications Advisor, also, remove any of these staff members for cause;
 
 
 10
 4. Arrange seminars for student publications personnel with skilled publications experts for discussion of reporting, editing, and other journalistic techniques;
 
 
 11
 5. Provide the Thorobred News and Thorobred yearbook staffs with counsel, and encourage them to maintain for fiscal, news and editorial responsibilities.
 
 
 12
 In subsidizing the Thorobred News through the Student Publications Board, the University expects the newspaper to maintain at least these two standards of quality control.
 
 
 13
 1.Report accurately and fairly newsworthy campus events; and
 
 
 14
 2.Pursue important news events to make sure they are reported and commented upon on the editorial pages with comprehension and full understanding of the facts.
 
 
 15
 Since the Thorobred News is not an "official" organ of the University, the Student Publication Board shall cause to be inserted in the masthead a standing and distinct disclaimer indicating that the views expressed are not necessarily those of the University, but rather are those of the named student author, editor or board of editors. In setting qualifications for the editors of the newspaper and yearbook, the Board shall include a sufficiently high academic average or the successful completion of a basic journalism course, or both. To assure that the newspaper and yearbook is not overwhelmed by ineptitude and inexperience, the Board shall require the use of an experienced advisor. In order to meet responsible standards of journalism, an advisor may require changes in the form of materials submitted by students, but such changes must deal only with the form or the time and manner of expressions rather than alteration of its content.
 
 
 16
 It is the responsibility of the editor to verify the accuracy of all printed matter, and to recognize that he/she will be subject to the legal exigencies that may arise from improper reporting of news.
 
 
 17
 Plaintiff Capri Coffer was the editor in charge of the 1992-94 yearbook. Although she was at first assisted by several other yearbook staff members, those members soon dropped out, leaving the sizeable task of creating the two-year Thorobred to Coffer. Coffer decided to structure the book around the theme "Kentucky State: Destination Unknown." She selected this theme because, in her words, "it was a commentary [on] just about everything that was happening at the University and within the lives of the students . . . . It was about . . . saying where are we going in our lives . . . . Destination Unknown, where am I going to be in five years from now[?] Where am I going to be ten years from now[?]" Coffer also chose to include a collection of photographs that depicted not only the goings-on at Kentucky State University, but current events in the community and around the world. Finally, Coffer chose a purple cover for the yearbook rather than the university colors of gold and green. Although it was not the first time the yearbook had been clad in non-university colors, Coffer explained that "we want[ed] to do something different. We wanted to bring Kentucky State University into the nineties. . . . I wanted to present a yearbook to the student population that was what they ha[d] never seen before."
 
 
 18
 When the final copies of the yearbook arrived at KSU, defendant Betty Gibson, then Vice-President for Student Affairs, was displeased with the results of Coffer's efforts. Specifically, she was disturbed by the yearbook's purple cover, its vague theme and title "Destination Unknown," the inclusion of pictures of current events and public figures unrelated to KSU such as Ross Perot, Bill Clinton, and the Pope, the paucity of pictures of school figures and events, and the fact that many of the pictures lacked captions. After consulting with Mary Smith, University President, Gibson decided not to distribute the yearbook and instructed Leslie Thomas, Director of Student Life, to secure the books with the intent to later discard them.
 
 
 19
 According to plaintiffs, Gibson's attempt to stifle student speech at KSU extended also to the student newspaper. Plaintiffs contend that certain comic strips were no longer published in the paper after Gibson had criticized them for making fun of theadministration and other aspects of life at KSU. Furthermore, plaintiffs allege that in November of 1994, Gibson directed the Publications Coordinator, Laura Cullen, to prohibit the newspaper from printing a particular letter to the editor and to convince the students to publish more positive news in the paper. Cullen refused to censor the content of the student newspaper on grounds that it would violate the students' First Amendment rights. Following Cullen's refusal, and not coincidentally, plaintiffs assert, on the same day Gibson received the final copies of the yearbook, Cullen was transferred without notice or hearing from her position as Publications Coordinator to an unspecified position in the Housing Office.
 
 
 20
 With regard to the reason for her transfer, in her deposition testimony, Cullen said:
 
 
 21
 The letter didn't have anything to do with my transfer.
 
 
 22
 The requests that were made by Mrs. Gibson or the demand that it didn't run. And she seemed to be angry with me on the phone when I spoke with her that morning. And I was . . . a little tired of the same argument that I could not and would not influence my students' decisions in this matter. And I do remember phrasing something along the lines of we've talked about this before kind of discussion. And I knew when I hung up that she was angry with me . . . she said not to run the letter . . . . And I again deferred to my students' decisions.
 
 
 23
 Nearly a month later, after Cullen had protested her transfer through the appropriate KSU grievance procedure, she was reinstated to her previous position. Upon reinstatement, Cullen received a memorandum from Gibson which stated in relevant part:
 
 
 24
 Prior to returning to your position as Coordinator of Student Publications, I find it necessary to give you specific expectations of your job performance.
 
 
 25
 . . . .
 
 
 26
 2. More positive news is to be published;
 
 
 27
 3. There must be coverage of all campus events--athletics, cultural, social and academic;
 
 
 28
 . . . .
 
 
 29
 5. The paper must be reviewed by The Student Publications Board before going to print;
 
 
 30
 6. Must meet all deadlines for yearbook and monitor clearly the content;
 
 
 31
 Your job performance will be reassessed in sixty (60) days.
 
 
 32
 Plaintiffs contend that Gibson's memo, in addition to her other actions regarding Cullen and the KSU newspaper, constituted unconstitutional attempts to control the content of The Thorobred News.
 
 
 33
 On November 22, 1995, plaintiffs filed suit in federal court, individually and on behalf of a proposed class of KSU students, naming as defendants Betty Gibson, Mary Smith, and eleven other individuals who comprised the governing Board of Regents of KSU. Plaintiffs claimed, pursuant to 42 U.S.C. § 1983, that Gibson's interference with the newspaper and her refusal to distribute the yearbook violated their First Amendment rights to free speech and expression and to free association. Plaintiffs also claimed that defendants' confiscation of the yearbook deprived them of property rights in violation of the Fourteenth Amendment and breached a contractual duty to provide students with a yearbook in return for the mandatory $80.00 student activities fee. Finally, plaintiffs alleged that defendants' actions constituted an arbitrary exercise of governmental power in violation of Section 2 of the Kentucky Constitution.
 
 
 34
 Plaintiffs sought damages and injunctive relief. Specifically, plaintiffs asked the court to order KSU to distribute the 1992-94 yearbooks as promised and to cease further attempts to control the content of student publications. Plaintiffs also sought class certification for all former andpresent KSU students who, like plaintiffs, were either consumers of or contributors to the student newspaper and yearbook.
 
 
 35
 On December 11, 1995, defendants moved to dismiss plaintiffs' First Amendment claims, their claims of breach of contract and deprivation of property, and all claims made against defendants in their official capacities. By Memorandum Opinion entered on June 26, 1996, the district court granted the motion in part. Citing Eleventh Amendment immunity, the court dismissed all claims for monetary damages against defendants in their official capacities. The court also dismissed plaintiffs' due process claim, stating that neither plaintiffs' unilateral expectation in obtaining a yearbook nor plaintiffs' alleged contract for goods rose to the level of a vested property right. Without expressing its reasoning, the court also dismissed plaintiffs' First Amendment freedom of association claim. Finally, the court dismissed the plaintiff's request for class certification, reasoning that the proposed class of "all present and former students" of KSU would be unmanageable and that the complaint lacked a sufficient factual basis upon which to determine that plaintiffs would adequately represent the interests of the proposed class. The court held, however, that plaintiffs did have First Amendment standing and therefore denied defendants' motion to dismiss plaintiffs' freedom of speech and breach of contract claims.
 
 
 36
 On June 20, 1997, the parties filed cross-motions for summary judgment. By Memorandum Opinion entered on November 14, 1997, the district court granted summary judgment in favor of defendants. With regard to the newspaper, the court held that plaintiffs had failed to demonstrate injury-in-fact sufficient to confer standing for a First Amendment claim. The court explained that neither the transfer of Cullen nor plaintiffs' allegations of censorship by Gibson amounted to a claim of specific present objective harm, and that plaintiffs had failed to allege a specific threat of future restraint.
 
 
 37
 As to plaintiffs' freedom of speech claim regarding The Thorobred, the district court concluded that the yearbook was a nonpublic forum, reasoning as follows:
 
 
 38
 The plaintiffs have put forth no evidence that The Thorobred was intended to reach or communicate with anybody but KSU students. . . . [T]he plaintiffs do not contend that the yearbook was held out to the public; instead, the plaintiffs have aptly stated that the yearbook was a student publication, prepared and distributed to the students by the students.
 
 
 39
 As can be seen, then, the yearbook was not intended to be a journal of expression and communication in a public forum sense, but instead was intended to be a journal of the "goings on" in [a] particular year at KSU.
 
 
 40
 The court thus concluded that the KSU administration was entitled to and in fact did exercise reasonable discretion in confiscating the yearbook.
 
 
 41
 Next, the district court addressed plaintiffs' state contracts claim. First, the court held that in refusing to distribute the yearbook, defendants did not act in their individual capacity, but in their official capacity, and therefore may not be held liable as individuals for breach of contract. Because the claim against defendants in their official capacity was for monetary damages, the court held, defendants are entitled to Eleventh Amendment sovereign immunity.
 
 
 42
 Finally, with regard to plaintiffs' claim under Section 2 of the Kentucky Constitution, the court held that because defendants had the right to exercise reasonable control over the yearbook, defendants' actions may not be considered unconstitutionally arbitrary and capricious.
 
 
 43
 The district court therefore granted defendants summary judgment on each of plaintiffs' remaining claims and dismissed the case.
 
 II.
 
 44
 This court reviews de novo the district court's grant of motions for summary judgment and to dismiss. Trustee of the B.A.C. Local 32 Ins. Fund v. Fantin Enters., Inc. 163 F.3d 965, 968 (6th Cir. 1998).
 
 A.
 
 45
 We first consider plaintiffs' contention that the district court erred in granting defendants summary judgment on plaintiffs' First Amendment claim regarding The Thorobred yearbook.
 
 
 46
 Through the 1970s and early 1980s, federal courts were faced with a multitude of actions brought by college newspapers challenging university administrators' attempts to censor the newspapers' choice of editorial content and advertisement. In virtually all of these cases, the courts held that the protections afforded by the First Amendment reached "beyond the schoolyard gates" to protect college newspapers. See, e.g., Stanley v. Magrath, 719 F.2d 279 (8th Cir. 1983) (finding violation of students' First Amendment rights to free expression where university cut student newspaper's funding at least in part because the university disapproved of its content); Schiff v. Williams, 519 F.2d 257 (5th Cir. 1975) (holding that university's dismissal of student newspaper editors because the university disapproved of the paper's editorial content violated students' First Amendment rights); Joyner v. Whiting, 477 F.2d 456 (4th Cir. 1973) (holding that university's withdrawal of funds from student newspaper violated students' rights to free expression); Bazaar v. Fortune, 476 F.2d 570 (5th Cir. 1973) (holding that university censor of student literary publication violated students' rights to free speech); Antonelli v. Hammond, 308 F. Supp. 1329 (D. Mass. 1970) (holding that a requirement that all material to be published in student newspaper be reviewed by university administrators violated students' rights to free expression); Korn v. Elkins, 317 F. Supp. 138 (D. Md. 1970) (holding that university's excision of repugnant material from student publication violated students' First Amendment rights).
 
 
 47
 The broad First Amendment protection afforded students by these cases has not proven to be without limit, however. In Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988), the Supreme Court settled on a test for determining whether a particular student publication is entitled to the full First Amendment protection of a public forum or the more limited protection of a nonpublic forum. The framework established in Hazelwood applies to plaintiffs' claims in the instant action.[2]
 
 
 48
 In Hazelwood, staff members of a high school newspaper claimed that school officials had violated their First Amendment right to free expression by censoring certain articles scheduled to be published in the newspaper. The Court reasoned that before examining the propriety of the school officials' conduct, the Court must first assess the nature of thestudents' forum. The determinative element of such an inquiry, held the Court, is the intent of the school in chartering the publication. See Hazelwood, 484 U.S. at 267-69 (examining school policy toward school paper to determine whether school had created a public forum). If the school gave to the students full reign over the publication's content, then the school has evinced an intent to create a public forum.[3] In that case, the school must limit its supervision to reasonable time, place, and manner regulations, and any content-based prohibitions must be narrowly drawn to effectuate a compelling state interest. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983); Widmar v. Vincent, 454 U.S. 263, 269-70 (1981). Indeed, "[e]ven a content-neutral regulation of speech in a public forum must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication." Hays County Guardian v. Supple, 969 F.2d 111, 118 (5th Cir. 1992). The Court in Hazelwood noted, however, that if the school did not intentionally create a public forum, then the publication remains a nonpublic forum, and school officials may impose any reasonable, non-viewpoint-based restriction on student speech exhibited therein. Hazelwood, 484 U.S. at 267; see also International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 683 (1992).
 
 
 49
 The Hazelwood Court concluded that the school board had not intended the high school newspaper to operate as a public forum and therefore upheld the administrators' censorship of the newspaper's editorial content. The Court cited the following evidence in support of its conclusion: (1) the newspaper was officially sponsored by the school as part of the journalism curriculum and was published as part of a journalism class; (2) the newspaper was under the direct and absolute editorial control of the journalism teacher who selected the paper's editors, set publication dates, assigned stories, advised in the development of stories, edited, participated in the selection of articles for publication, and negotiated with printers; (3) students received class credit and grades for their roles in publishing the paper; (4) and the school principal conducted final review of each issue of the newspaper prior to publication. Hazelwood, 484 U.S. at 268-69.
 
 
 50
 Several facts distinguish Hazelwood from the case before us. The Thorobred yearbook is not a product of the classroom as was the school newspaper in Hazelwood. Nor does it appear that the KSU Student Publications Board regularly intervened in the day-to-day operations of the yearbook staff. These facts and others doubtless indicate that KSU did not exercise control over The Thorobred to the same extent that the school officials controlled the student newspaper in Hazelwood. An absence of hands-on control, however, does not alone evince an intent to create a public forum. As the court in Hazelwood noted, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Id. (citation and internal quotation marks omitted). After careful consideration of the record, we must conclude that plaintiffs have offeredevidence insufficient as a matter of law to prove that the KSU administration intended The Thorobred to serve as a public forum.
 
 
 51
 At the time of defendant Gibson's confiscation of the 1992-94 yearbook, the sole written evidence of the university's intent regarding The Thorobred is found in a section of the KSU Student Handbook entitled "Student Publications." This excerpt explicitly states that both The Thorobred News and The Thorobred yearbook "shall be under the management of the Student Publications Board" and emphasizes that the Board "expects student editors and faculty advisors to adhere to high standards of journalistic ethics and the highest level of good taste and maturity in the integrity, tone and content of student publications."
 
 
 52
 The student handbook also offers several details regarding the Student Publications Board's role in supervising The Thorobred and The Thorobred News. The handbook states, for example, that the Publications Board shall approve the written publications policy of the publications, "including such items as purpose, size quantity controls, and time, place and manner of distribution." The handbook also provides that the Board shall appoint the publications' editors and may remove them for cause, and that the Board shall be responsible for negotiations with the publications' printers. Most notably, however, the handbook sets forth the university's requirement that the publications' staffs use an experienced advisor so that they will not be "overwhelmed by ineptitude and inexperience." According to the handbook, this advisor may require changes in "the form or the time and manner of expressions" to be published. Thus, although the university evinced an intention that students be allowed to determine the content of expression, it left ultimate control over the form and manner of that expression in the hands of the Publications Board.
 
 
 53
 Finally, and most telling, the handbook mandates that because KSU does not consider The Thorobred News to be "an 'official' organ of the University," the newspaper must insert a disclaimer "indicating that the views expressed are not necessarily those of the University, but rather are those of the named student author, editor or board of editors." The exclusion of the yearbook from this requirement evidences KSU's intent that the yearbook bear the imprimatur of KSU and serve, as defendant Gibson testified, as a KSU-sponsored representation of student life at the university rather than as an open forum for student expression.
 
 
 54
 In view of the extent of control retained by the KSU Board of Regents through the Student Publications Board, any evidence that KSU intended The Thorobred to be a public forum is equivocal at best. Although the student handbook states, for example, that "it is the intent that both [publications] shall be as free of censorship as prevailing law dictates," such language merely begs the question of the breadth of the applicable law. The language certainly contains nothing to suggest an intent by the university to expand the protection afforded student speech in a nonpublic forum to that of a public forum. See Hazelwood, 484 U.S. at 269. Nor does the fact that the university had not yet adopted an official policy regarding the scope of The Thorobred's intended purpose indicate an intent to open the yearbook's pages for the unfettered use of its student editors. Again, absent an expression of intent "by policy or by practice," Perry Educ. Ass'n, 460 U.S. at 47, to the contrary, we must conclude that KSU intended The Thorobred to remain a nonpublic forum.
 
 
 55
 Because plaintiffs have alleged facts insufficient as a matter of law to indicate an intent by KSU to relinquish editorial control over The Thorobred to the students, defendants were entitled to regulate the contents of the yearbook in any reasonable manner. We uphold the districtcourt's conclusion that defendants' confiscation of the 1992-94 Thorobred was reasonable in light of the yearbook's failure to accomplish its intended purpose. It is no doubt reasonable that KSU should seek to maintain its image to potential students, alumni, and the general public. In light of the undisputedly poor quality of the yearbook,[4] it is also reasonable that KSU might cut its losses by refusing to distribute a university publication that might tarnish, rather than enhance, that image. As plaintiffs contend, it may have been more reasonable for the Publications Board to have monitored the quality of plaintiff Coffer's work during the yearbook's completion, rather than expressing so harshly its disapproval upon receiving the final product. Defendants correctly note, however, that regulation of speech in a nonpublic forum "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." International Soc'y for Krishna Consciousness, 505 U.S. at 683 (citation and internal quotation marks omitted).
 
 
 56
 We therefore affirm the disrict court's grant of summary judgment in favor of defendants on plaintiffs' First Amendment claim regarding The Thorobred yearbook.
 
 B.
 
 57
 Plaintiffs argue that the district court erred in granting defendants summary judgment on the claim that they violated plaintiffs' First Amendment right to free speech by attempting to control the content of the student newspaper.
 
 
 58
 The district court held that plaintiffs lack standing to bring a First Amendment claim with regard to the student newspaper because plaintiffs failed to demonstrate sufficient injury-in-fact. Specifically, the court stated that neither the transferral of Cullen nor plaintiffs' "bald allegations" that Gibson's criticism effected censorship of the publication amounted to "a claim of specific present objective harm or a threat of specific future harm."
 
 
 59
 Plaintiffs claim, in essence, that First Amendment standing does not require a showing that their speech was actually restricted by the university. Citing opinions from a federal district court and a New York court of claims, plaintiffs assert that their injury occurred upon the university's attempt to restrict their speech. See Antonelli v. Hammond, 308 F. Supp. 1329 (D. Mass. 1970) (holding that a university's requirement of submission for prior review and requiring "more positive news" constituted unconstitutional attempts to control the content of student publication); Mazart v. State, 441 N.Y.S.2d 600 (N.Y. Ct. Cl. 1981) (same). Similarly, plaintiffs note that at least one court has held that the removal of a faculty advisor alone constitutes unconstitutional injury to students. See Romano v. Harrington, 725 F. Supp. 687 (E.D.N.Y. 1989)
 
 
 60
 Even if we were to address the merits of plaintiffs' claims we note that they havefailed to allege that their faculty advisor, Ms. Cullen, acted upon defendant Gibson's improper demands, or indeed that the newspaper staff was even aware of Gibson's attempts to restrict their speech. Thus, plaintiffs' speech did not bear even the threat of prior restraint, and therefore they could have suffered no injury. The district court was correct to dismiss plaintiffs' First Amendment claim with regard to The Thorobred News.
 
 C.
 
 61
 In light of our holding with regard to plaintiffs' First Amendment freedom of expression claims, we affirm on the opinion of the district court its grant of summary judgment in favor of defendants on plaintiffs' breach of contract claim and plaintiffs' claim pursuant to the Kentucky State Constitution.
 
 
 62
 Regarding the district court's Rule 12(b)(6) dismissal of plaintiffs' remaining claims, we note that plaintiffs failed to mention in their notice of appeal either the district court's June 26, 1996, Rule 12(b)(6) dismissal, or its February 4, 1997, denial of reconsideration. Pursuant to Federal Rule of Appellate Procedure Rule 3(c), "[a] notice of appeal . . . must designate the judgment, order, or part thereof appealed from." This court has held that "[n]otwithstanding the absence of prejudice, . . . a defective notice of appeal can never confer jurisdiction on an appellate court . . . ." Brooks v. Toyotomi Co., 86 F.3d 582, 586 (6th Cir. 1996). Accordingly, it appears that we may not have jurisdiction to hear plaintiffs' due process claim, its freedom of association claim, and its request for class certification.
 
 
 63
 Even should we have jurisdiction over plaintiffs' challenges to these rulings, however, and we specifically decline to rule on the issue, we would affirm for the reasons stated by the district court in its rulings on plaintiffs' due process claim and its freedom of association claim. With no viable claims upon which to request class certification, that request is moot.
 
 III.
 
 64
 For the reasons stated above, we affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 Although plaintiffs cite to a "Student Publications Board Governing Policy" in support of their claims, plaintiffs conceded in their Reply Brief that this policy was not adopted by the Board until after the occurrence of the events underlying this action.
 
 
 [2]
 Plaintiffs assert that because a university student publication is under the control of private individuals--that is, the students--it is subject to the same unqualified First Amendment protection as, for example, The New York Times, thus making the Hazelwood public forum analysis inappropriate. Plaintiffs cite several cases both to the effect that student publications are private, and not state, actors and that a publication does not become an arm of the state merely because it accepts government funds and other benefits.
 Plaintiffs' argument in this regard is without merit. A state-funded and school-supervised (to any extent) publication, operated on state property and with the use of state-owned hardware and materials is clearly a creature of, if indeed not a creation of, the state. Thus, although a university's lack of involvement in the regulation of such a publication's editorial content might evince an intent to create a public forum, the university's ties with the publication clearly indicate state, not private, ownership. The publication is thus subject to the public forum analysis delineated by the Court in Hazelwood. See Greg C. Tenhoff, Censoring the Public University Student Press: A Constitutional Challenge, 64 S. Cal. L. Rev. 511, 521 (1991).
 
 
 [3]
 Although a school publication does not normally qualify as a traditional public forum--that is, a place such as a public sidewalk open for speech by the general public--such a forum might constitute what is currently referred to among legal academics as a "limited public forum," or a "public forum by designation." A public forum by designation has been defined by the Court as "a place or channel of communication for use by . . . certain speakers, or for the discussion of certain subjects." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 802 (1985). A limited public forum is entitled to the full First Amendment protection given a traditional public forum. Perry Educ. Ass'n, 460 U.S. at 46.
 
 
 [4]
 Plaintiffs do not dispute Gibson's factual assertions that the yearbook lacked captions and displayed a dearth of photographs of school personages and functions. Plaintiffs do contend that Gibson's quality concerns were pretextual and that her true reason for confiscation of the yearbook was her disapproval of the yearbook's message. However, viewpoint discrimination occurs when the government's motivation for regulating speech is a distaste for the "specific motivating ideology or the opinion or perspective of the speaker." Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). The government may not regulate speech based on disapproval of a particular viewpoint, even in a nonpublic forum. Plaintiffs have presented no evidence, however, that Gibson disagreed with the politics of the yearbook or indeed that the yearbook even contained a political message. With regard to Gibson's reaction to the yearbook's theme "Destination Unknown," Gibson merely testified that "I can't tell you what that meant." Moreover, even if Gibson had banned distribution based upon her disapproval of this theme, plaintiffs have presented no evidence that such disapproval related to viewpoint discrimination, rather than to content that exceeded the scope of the yearbook's chartered purpose.
 
 
 CONCURRING IN PART, DISSENTING IN PART
 
 65
 R. GUY COLE, JR. Circuit Judge, concurring in part and dissenting in part.
 
 
 66
 I agree with the majority's disposition of the plaintiffs' First Amendment claim as it relates to the KSU newspaper and its disposition of the plaintiffs' state law claims. I write separately because I disagree with the majority's determination that the university's yearbook was a nonpublic forum and therefore subject to reasonable restrictions by the university. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 n.7 (1983).
 
 
 67
 In finding that the yearbook was a nonpublic forum, the majority relies heavily on Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988). To begin, it is worth emphasizing that the Supreme Court in that case was addressing the scope of the First Amendment in the context of high school student publications. While showing considerable deference to high school administrators and teachers to regulate the content of school publications, the Court also stated, "We need not now decide whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level." Id. at 273 n.7. The majority fails to acknowledge this point, instead applying the same level of deference to KSU as the Court did to Hazelwood East High School. Neither this court nor any of our sister circuits have taken a position on this issue, and I hesitate to do so implicitly, as the majority has done.[1]
 
 
 68
 Even if this court were to afford the same level of deference to colleges and universities as high schools, I disagree with the majority's application of Hazelwood to this case. The majority acknowledges that KSU's student handbook, already in effect in 1992, expresses the university's "intent that both [publications] shall be free of censorship as prevailing law dictates." The majority then determines, however, that KSU did not intend to expand the protection afforded the yearbook from a "nonpublic forum to that of a public forum," Majority Opinion at 16, because the handbook requires that the school newspaper insert a disclaimer - "indicating that the views expressed are not necessarily those of the University, but rather are those of the named student author, editor or board of editors" - but makes no such requirement of the yearbook. Based on this distinction, the majority concludes that KSU "inten[ded] that the yearbook bear the imprimatur of KSU and serve . . . as a KSU-sponsored representation of student life at the university rather than an open forum for student expression." Majority Opinion at 728.
 
 
 69
 While I agree that the yearbook is not a traditional public forum, I take issue with the majority's conclusion that it must therefore be a nonpublic forum. The majority makes this finding only by ignoring the third classification of a limited public forum. A limited public forum is "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 802 (1985). For a limited public forum, as with a traditional public forum, "[r]easonable time, place and manner regulations are permissible, and a content- based prohibition must be narrowly drawn to effectuate a compelling state interest." Perry Educ. Ass'n, 460 U.S. at 46.
 
 
 70
 The majority's emphasis on the absence in the student handbook of a disclaimer for the yearbook is misguided. It does not make sense to infer the university's intent in one section of the handbook when a different section of the handbook actually states the university's intent. The handbook requires that both the newspaper and the yearbook have a Student Publications Advisor, who "may require changes in the form of materials submitted by students." Any changes, however, "must deal only with the form or the tim e and manner of expressions rather than alteration of its content." (emphasis added). This language is very similar to the wording in Perry Education Association, discussed supra, defining the First Amendment protection afforded a limited public forum.[2] Applying this heightened standard of review, I believe that the university's proffered reasons for withholding distribution of the yearbook for the period of 1992-94 - inappropriate theme or title, poor quality - are content-based restrictions that do not serve any compelling governmental interest. See Perry Educ. Ass'n, 460 U.S. at 46. Accordingly, in my view, the university may not withhold issuance of the 1992-94 yearbook.
 
 
 71
 For the foregoing reasons, I respectfully DISSENT from the majority's opinion asit relates to its treatment of the university's yearbook.
 
 
 
 Notes:
 
 
 [1]
 That said, I believe that there is reason for courts to afford colleges and universities greater deference than they do high schools. While it may be a stretch to consider college-aged students full adults, a school's concern for the "emotional maturity of the intended audience," Hazelwood, 484 U.S. at 272, is certainly less pressing for college students than for high school students. Most students are at least eighteen years old when they enter college, an age at which society affords them some of the same rights as adults (i.e., the right to vote).
 
 
 [2]
 This conclusion also comports with common sense. A yearbook is a student publication constructed by students, intended for students. It reflects their perspective of the college experience, evidenced, for example, by the fact that upperclasspersons are allowed to include a personal caption with their individual class photograph, the content of which may or may not be a "KSU-sponsored representation of student life."