Elizabeth HANSEN, Constance Hansen, and Ralph Martin, Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS, et al., Defendants.

No. 02CV72802DT.

United States District Court, E.D. Michigan, Southern Division.

Dec. 5, 2003.

Robert J. Muise, Esq., Thomas More Law Center, Ann Arbor, MI, for Plaintiff or Petitioner.

Seth M. Lloyd, Esq., Dykema Gossett, Detroit, MI, for Defendant or Respondent.

*OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. INTRODUCTION

This case presents the ironic, and unfortunate, paradox of a public high school celebrating "diversity" by refusing to permit the presentation to students of an "unwelcomed" viewpoint on the topic of

homosexuality and religion, while actively promoting the competing view. This practice of "one-way diversity," unsettling in itself, was rendered still more troubling—both constitutionally and ethically—by the fact that the approved viewpoint was, in one manifestation, presented to students as religious doctrine by six clerics (some in full garb) quoting from religious scripture. In its other manifestation, it resulted in the censorship by school administrators of a student's speech about "what diversity means to me," removing that portion of the speech in which the student described the unapproved viewpoint.

All of this, of course, raises the question, among others presented here, of what "diversity" means and whether a school may promote one view of "diversity" over another. Even accepting that the term "diversity" has evolved in recent years to mean, at least colloquially, something more than the dictionary definition, the notion of sponsorship of one viewpoint to the exclusion of another hardly seems to further the school's purported objective of "celebrating diversity." In this context, it would do well to recall the Supreme Court's admonition in another school speech case:

> In our system, state-operated schools may not be enclaves of totalitarianism... [and] students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved.

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

Before moving to an analysis of the case, it remains only to make clear not only what this case is about, but what it is not

about. It is not about intolerance towards homosexuality or the appropriateness, religiously or otherwise, of different lifestyles. The case is, however, about tolerance of different, perhaps "politically incorrect," viewpoints in the public schools.

## II. *PERTINENT FACTS*

### *THE PARTIES*

Plaintiff Elizabeth ("Betsy") Hansen was, at the time of the events giving rise to this action, a senior at Ann Arbor Pioneer High School ("Pioneer" or "PHS") and a member of the PHS student organization, "Pioneers for Christ" ("PFC").[1] Plaintiff Constance Hansen is Elizabeth's mother. Constance Hansen also has a minor son who was a sophomore at PHS during the 2001–2002 school year who is currently a senior at PHS. She also has a minor daughter who is currently a sophomore at Pioneer. Ralph Martin is the father of Maureen Martin who, in March 2002, like Elizabeth Hansen, was a senior at PHS.

Defendant Ann Arbor Public Schools is a Michigan public school district. Pioneer High School is a part of the Ann Arbor Public Schools. It has an enrollment of approximately 2,700 students. Defendant Henry Caudle is the Principal of Pioneer High School. Defendant Lara Erickson is a "class principal," which is an assistant principal position at PHS.[2] Defendant Sunnie Korzdorfer is a teacher at PHS. During the 2001–2002 school year, Ms. Korzdorfer was the faculty advisor of the PHS Student Council and was responsible for the "2002 Diversity Week" events. Defendants Parker Pennington, IV and Rodney Mancini, are also teachers at PHS. Pennington and Mancini are the faculty advisors for Pioneer's "Gay/Straight Alliance" ("GSA"). Defendant Denise Eaddy-Rich-

---

1. Miss Hansen graduated in June 2002 and is now attending the University of Florida.

2. There are four class principals at PHS, one for each grade, 9–12. [Erickson Dep., p. 10.]

ardson is currently a high school counselor in Ann Arbor. During the 2001–2002 school year, Ms. Eaddy–Richardson, who is also a licensed attorney, held the position of "Equity Ombudsman" for the Ann Arbor Public Schools, an administrative position reporting directly to the Superintendent of Schools.[3] Among Ms. Eaddy–Richardson's responsibilities as Equity Ombudsman was ensuring compliance with the school district's nondiscrimination and harassment policies.

## PIONEER HIGH SCHOOL'S "DIVERSITY WEEK"

For at least ten years, Pioneer High School has been holding a "Diversity Week."[4] Traditionally, the week's activities include a general assembly program, panel discussions on race, religion and sexual orientation, an "open mic" session during lunch hour, and a number of multi-cultural activities involving music and food. The panel discussions are held during class time in the PHS "Little Theater," and teachers sign up to bring their classes to hear the discussions.[5]

Diversity Week 2002 was held March 18–22. The week's events were organized by the Student Council under the supervision of faculty advisor, Sunnie Korzdorfer. Tom Jensen, Student Council President in 2002, testified in his deposition that with regard to the choice of events and any decisions that had to be made with regard to the running and organization of Diversity Week, the Student Council had to obtain the approval of Ms. Korzdorfer.

[Jensen Dep., pp. 47–48.] Ms. Korzdorfer testified that she, in turn, answered to Class (i.e., Assistant) Principal Lara Erickson, and that the ultimate approval/decision-making authority rested with PHS's principal, Henry Caudle. [Korzdorfer Dep., p. 17.]

## THE "HOMOSEXUALITY AND RELIGION" PANEL

Although in previous years, the Student Council organized all of the panel discussions, because in 2002 the Council had decided to add a number of new activities to the week's events, Ms. Korzdorfer and Student Council President Tom Jensen decided that it was going to be difficult for them to plan all of the activities. Therefore, the decision was made to solicit other student organizations to assist with organizing the panels. E-mails were sent to club advisors. The only club to respond to the Student Council's invitation was the Gay/Straight Alliance. The GSA asked if it could run the sexual orientation panel. Ms. Korzdorfer agreed, and turned over entirely the sponsorship and administration of this panel to the GSA and its co-sponsors, Parker Pennington and Rodney Mancini.[6] [See Parker Pennington Dep. Ex. 1.] The Student Council retained responsibility for the race and religion panels, along with its responsibility for the other Diversity Week activities.

Traditionally, the panels presenting the three race, religion, and sexual orientation panel discussions were composed of PHS

3. The funding for the Equity Ombudsman position terminated and the position was eliminated in June 2002. Ms. Eaddy–Richardson is now a counselor at Ann Arbor's Huron High School.

4. For a number of years, the activity was referred to as "Cultural Awareness Week." The name was changed to "Diversity Week" four or five years ago. [See Parker Pennington Dep., pp. 72–73].

5. Students, however, may opt out of attending and request to go to the library instead if their teacher is taking the class to the panel discussion. Also students whose teachers have chosen not to take their classes to the panel may ask for permission from their teachers to attend themselves.

6. Pennington and Mancini are both openly gay and have been the faculty advisors for the GSA since the club's inception at Pioneer.

students and this was the anticipated format when Diversity Week 2002 was being planned. In fact, the Student Council continued with the student-composed panel format with the "race" and "religion" panels that it organized.

The Gay/Straight Alliance, however, decided to change both the composition and the format of the panel that it was organizing. First, instead of presenting a panel discussion on "sexual orientation," the GSA decided to change the panel's topic to "Religion and Homosexuality." Second, the GSA decided that, instead of having PHS students as presenters, its "Religion and Homosexuality" panel would be composed of adult religious leaders from the Ann Arbor community. Parker Pennington, the GSA's faculty advisor, testified in his deposition that the decision was made to have adult religious leaders as presenters instead of students because the club "want[ed] to have people who could speak with some authority on some of the more technical aspects of things." [Pennington Dep., p. 88.] Pennington explained that by "technical aspects," he meant:

> A: Instead of personal belief actually being able to make reference to religious documents and that sort of thing that people would have studied extensively as opposed to a less learned approach maybe that students might have.
>
> Q: And religious documents are you referring to, for example, the Bible?
>
> A: That would be one such document, yes.

*Id.* at 88–89.

Pennington said that the GSA had noted from several previous sexual orientation panel discussions, that a lot of the more controversial aspects revolved around people's religious backgrounds and religious objections to homosexuality. Therefore, he and the club members decided that "it would be best not to have kids discuss . . .

but to have biblical scholars or people trained in a more scholarly way to deal with the [ ] complex nature of the interpretations of various passages of various [religious] documents. . . ." *Id.* at 157.

Pennington testified that to come up with a list of the adults to invite to be panel members on the Homosexuality and Religion panel, Pennington gave Jeremy O'Brien, the GSA club member who was working on the Diversity Week program, a copy of *Pride Source*, a guidebook for gay and lesbian resources in the State of Michigan, which included a listing of churches. *Id.* at 90. This listing was supplemented with names which Rodney Mancini, co-sponsor of the GSA, obtained from his minister, Rev. John Nieman of St. Andrews Episcopal Church. [Mancini Dep., pp. 14–17.] According to Mancini, his minister "is very gay friendly" and his input was sought because he would "add a positive perspective" on homosexuality and religion. *Id.* at p. 138. Pennington explained the purpose of having gay friendly religious leaders as presenters: "Messages of religious disapproval are common on the radio and television and in print. This panel [was] specifically designed to offer a more welcoming message." *Id.* at 91. The members of the panel were selected "because the institutions they represent were welcoming and affirming" with regard to homosexuality. *Id.* at 92; *see also* Mancini Dep. at 14–17. The panel that was ultimately selected consisted of two Episcopalian ministers, a Presbyterian minister, a Presbyterian deacon, a rabbi, and a pastor from the United Church of Christ.

### *BETSY HANSEN'S DESIRE TO PARTICIPATE IN, OR HAVE A REPRESENTATIVE ON, THE HOMOSEXUALITY AND RELIGION PANEL*

Tom Jensen, the PHS Student Council President in 2001–2002, testified that plan-

ning for the Diversity Week panel discussions began in January 2002 with a general student meeting. [Jensen Dep., Plaintiff's Ex. 16, p. 56.] [7] This first meeting was essentially a "brainstorming" session. He testified that students had said that, in previous years, Diversity Week had been boring. *Id.* Therefore, Student Council wanted student input and ideas to improve on the activity. *Id.* Jensen testified that Betsy Hansen attended this initial brainstorming meeting. *Id.*

Betsy Hansen testified that at the end of this initial meeting, Jeremy O'Brien, a GSA member, indicated to her that some members of the GSA were interested in "somehow bringing together homosexuality and religion." [Hansen Dep., pp. 89–90]. Betsy said that she told Jeremy that she was interested in being a part of the homosexuality panel and that Jeremy responded that it would be nice to get a new viewpoint. *Id.* at 89.

Tom Jensen also testified about Betsy and Jeremy's discussion. Jensen testified that the two students spoke with him after the January meeting and that they indicated to him that they thought it would be interesting to have a panel that focused on sexual orientation and religion together, in place of both the religion and sexual orientation panels that had been held in previous years. [Jensen Dep. at 57–58.] Jensen testified that he took the idea to the Student Council faculty advisor, Sunnie Korzdorfer, who told Jensen that they would follow up in February to see if Betsy and Jeremy were still interested. *Id.* at 60–61. At some point in early February, Jensen said he did again broach the subject with Betsy and Jeremy who each told him that they would communicate with their respective organizations, the Pioneers for Christ and the Gay/Straight Alliance. *Id.* He testified, however, that nothing more was said about the matter until February 22, 2002. *Id.*

On February 22, 2002, the Student Council held a "mandatory" meeting for students interested in being on the religion or sexual orientation panels. Signs were posted in the school and announcements were made over the public address system announcing the meeting. The signs and announcements stated:

> Are you interested in being on the religion or sexual orientation panels for Diversity Week, which will be held March 18th–22nd? A mandatory informational meeting will be held on Friday, February 22nd in room C310 at lunch for all potential participants. We look forward to seeing you then!

[Jansen Dep., pp. 18–19 and Dep. Exhibit 2.]

Sunnie Korzdorfer testified that the students who were planning the meeting were the ones who made this meeting "mandatory," and since Tom Jensen headed up that group, he had the authority to say that the meeting was a mandatory one. [Korzdorfer Dep., p. 77, 80.] [8] Betsy Hansen, however, was unable to attend the February 22 meeting because she was ill and absent from school that day. [Hansen Dep. p. 91] However, she asked her friend and fellow PFC member Kirsten Raab, who was planning to attend the meeting, to let her know what she needed to know and to sign her

---

7. Although Sunnie Korzdorfer was the faculty advisor of the Student Council, she was less than forthcoming in her deposition, responding evasively to almost every pertinent question, "I don't know," "I don't remember," "I don't recall," and the like. *See e.g.,* Korzdorfer Dep. pp. 44–45, 48, 57–61. Tom Jensen, however, responded quite specifically to all questions concerning the planning of Diversity Week.

8. Tom Jensen testified that he and Sunnie Korzdorfer were the ones who decided that the meeting would be mandatory. [Jensen Dep., p. 19.]

up for the Homosexuality and Religion panel. [Hansen Dep., p. 92.]

Kirsten Raab did attend the February 22 meeting and told Sunnie Korzdorfer that Betsy Hansen was interested in being on the Homosexuality and Religion panel. [*See* Korzdorfer Dep., p. 76.] According to Korzdorfer, she told Kirsten that if Betsy wanted to be on the panel she had to be at the meeting that day. *Id.* at 77. Korzdorfer testified that Betsy came to her personally the next day and expressed her interest in being on the homosexuality panel. *Id.* at 70. However, she did not indicate in her deposition that she ever told Betsy at that time that she could not be on the panel because she did not attend the meeting the day before.

Ms. Korzdorfer testified that she did not know whether any provisions were made for students who were absent from school the day of the meeting, or whether if a student was not at that meeting because of illness, that would have precluded the student from being on the panel. *Id.* However, Tom Jensen testified that, although there was nothing in writing, the "historical" practice was that

if students were—missed a mandatory meeting and there had been sufficient advertisement of it, such as signs throughout the school three days prior and announcements prior, they were let on the panel if they either sent a friend who told Wendy Day [9] the student council advisor, or I, explicitly what panel that individual wanted to be on, [or] if they sent an e-mail to Wendy Day by the end of the day that the . . . mandatory meeting was scheduled for, or if they

had expressed an interest to herself of myself prior to the day of that meeting. [Jensen Dep., pp. 19–20.]

Jensen testified that at least on the religion panel, in which he personally participated, there were students on that panel who did not attend the February 22nd meeting. *Id.* at 23. Sunnie Korzdorfer also testified that there were students who participated on the two race and religion panels who did not attend the first mandatory meeting. [Korzdorfer Dep., p. 106.]

In fact, the February 22, 2002 mandatory meeting was sparsely attended. [Jensen Dep., p. 21. *See also,* Korzdorfer Dep., p. 71.] Because the Student Council was dissatisfied with the number of students who attended the February 22 meeting, the decision was made on March 4th to open it back up for students who were interested in serving on panels, and, therefore, another "mandatory" meeting was set for March 8th. [Jensen Dep., pp. 23–24.] Like the February 22 meeting, the March 8th meeting was advertised by way of posters and PA announcements which stated:

Do you want a chance to express yourself in front of your peers? Sign up to be on the Race, Religion, or Sexual Orientation Panel for Diversity Week! Check in with Ms. Korzdorfer in room C310 by Friday, March 8th and attend a lunchtime meeting on that day in her room to get the specifics about when and where the panels are going to be held. [Jensen Dep., pp. 23–24 and Dep. Ex. 3.]

Jensen testified that it was on March 4th, at the same time that the decision was made to hold the second mandatory meeting in an attempt to increase the number of student participants in the panel, that

9. Wendy Day was the previous Student Council faculty advisor. She was faculty advisor from September 2000 to January 2002. [Jensen Dep., p. 20.] In the fall semester of 2001– 2002, (i.e., from September 2001 to January 2002), Ms. Day and Ms. Korzdorfer were co-advisors.

Sunnie Korzdorfer and Jensen decided it was going to be very difficult for the Student Council to plan all of the new activities they were going to have during Diversity Week 2002 and the three panels. Therefore, Korzdorfer and Jensen decided to allow student organizations to run the panels if they so chose. *Id.* at 46. He and Sunnie composed an e-mail and sent it out to all faculty members. *Id.* at 46–47. As noted, the only club to respond was the Gay/Straight Alliance. *Id.*

On March 8th, Betsy Hansen went to Ms. Korzdorfer's room to attend the advertised second mandatory meeting. Upon arriving at this meeting, she was informed that the GSA had taken over the Homosexuality and Religion panel. [Hansen Dep., p. 95.] She encountered Jeremy O'Brien at this meeting who told her that the Homosexuality and Religion panel would not be having any students on it; that the GSA had decided that adult religious leaders would be the presenters. *Id.* at 96–97.

Betsy subsequently went to talk to Sunnie Korzdorfer and asked if she could invite an adult clergyman of her or PFC's choosing to participate on the Homosexuality and Religion panel.[10] Korzdorfer testified that she responded, "That's a very good question, I don't know the answer to it, why don't you see if you can find some adults, get me their names and numbers and I'll see what I can do." [Korzdorfer Dep., pp. 152–53.] Betsy testified that Ms. Korzdorfer left her with the impression that it was up to her to find some adults and if she found them they could be on the panel. [Hansen Dep., p. 77.] Korzdorfer admitted that she did not give Betsy any deadline for getting her the names nor did she relay Betsy's request to Parker Pennington, Rodney Mancini or any member

of the GSA. [Korzdorfer Dep., p. 152.] According to Betsy, she had a subsequent conversation with Ms. Korzdorfer a few days later in which she told Korzdorfer that she had the names of some pastors to bring in for the panel. [Hansen Dep., p. 100.] She admitted that she did not, however, give her any specific names; only that she had the names. *Id.* Shortly after her conversation with Betsy, Ms. Korzdorfer decided to cancel the panel. [Korzdorfer Dep., pp. 152–53.] According to Betsy, it was on or shortly before March 13 that Korzdorfer told her she was cancelling the Homosexuality and Religion panel. [Hansen Dep., pp. 101,109.]

In fact, it was on Tuesday, March 12, 2002, that the decision was made to cancel the panel. [*See* PFC advisor William Johnson Dep., pp. 63–73; Principal Henry Caudle Dep., pp. 70–73.] On March 12, a meeting was held with Korzdorfer, PHS Principal, Henry Caudle, Class principal, Lara Erickson, Equity Ombudsman Denise Eaddy–Richardson, and Pioneers for Christ advisor, Bill Johnson. According to Bill Johnson, Principal Caudle called the meeting to address two issues concerning the Pioneers for Christ—one was the Homosexuality and Religion panel issue, and the other was an unrelated issue concerning a student in a speech class who was also a PFC member. [Johnson Dep., pp. 66–67.]

Johnson testified that with respect to the Homosexuality and Religion panel, the focus of the meeting was the desire of some students in Pioneers for Christ (including Betsy Hansen) to have their view presented at the religion and homosexuality panel as they had in previous years when it was focused more on sexual orientation than the relationship between sexuality and religion. *Id.* at 65.[11] After dis-

---

10. Betsy testified that she wanted her representative to convey the message that the Bible

teaches that homosexuality is a sin. [Hansen Dep., p. 124.]

11. Johnson testified that, prior to the meeting,

cussion, the consensus of this meeting was that Betsy Hansen should be allowed representation on the panel. [*See* Eaddy–Richardson Dep., pp. 32–35, 67.] Bill Johnson testified Ms. Korzdorfer was concerned because she knew that the GSA did not want a viewpoint on the panel that was different from their own. [Johnson Dep., at 65.] Not wanting to have to deal with a dispute over differing viewpoints, Korzdorfer decided to cancel the panel. According to Johnson,

> Ms. Korzdorfer was feeling stress about the situation and she knew that the GSA was not happy about the possibility of Betsy being on the panel And at the meeting, when the equity officer [Eaddy–Richardson] said that it was equitable and fair for Betsy to have a voice on the panel, her [Korzdorfer's] solution that she proposed to Mr. Caudle was just to cancel it.

*Id.* at 69–70. Principal Caudle agreed with Korzdorfer's proposal. [Caudle Dep., pp. 70–71.] [12]

News that the Homosexuality and Religion panel was going to be cancelled raised the ire of the GSA faculty advisors. Upon learning the news of the panel's cancellation, Parker Pennington e-mailed Sunnie Korzdorfer stating that he and his co-GSA advisor, Rodney Mancini, were "deeply disturbed" over the process by which the panel was scrubbed. [*See* Korzdorfer Dep. Ex. 25 appended to Korzdorfer Dep. at Plaintiff's Ex. 9.] He complained that he and Mancini had not had a chance to explain the purpose of the panel. *Id.*

Ms. Korzdorfer responded by e-mail that she, too, was "deeply disturbed," adding that the March 12 meeting was called by Principal Caudle "at the spur of the moment," and that she did not know what the meeting was going to be about until she got there. [*See* Korzdorfer Dep., pp. 218–224 and Dep. Ex. 25.] Korzdorfer then summarized the meeting and explained her decision to cancel the panel:

> The crux of the meeting was this: Pio's for Christ have a leagal [sic] right to be on the panel. It does not matter that the panel's intent is to show how religion and sexuality can go hand in hand. They have a leagal [sic] right to say that homosexuality [sic] is not a valid lifestyle. That is the bottom line.
>
> As a student council advisor I have two options.
>
> 1. Allow the Pio's for Christ to speak on the panel. This would fly in the face of the panel's intent and potentially cause hurt feelings all around.
>
> 2. Can[c]el the panel and lose the risk of offending people.
>
> *[GSA member—name obliterated]* and I spoke twice on Tuesday. I asked him what he wanted. He said he did not want Pio's for Christ to be able to put a member on the panel saying that homsexuality [sic] isn't valid. I supported his view and I still do. Thus, I canceled the panel. . . .
>
> This has been very difficult for everyone involved. . . . I am treading on shallow ground here, as I do not want to be

---

Betsy had expressed to him her desire that, if the panel were going to be only adults and she could not be on the panel because she was a student, she would like to have a clergy that represented her view be on the panel. [Johnson Dep., p. 70.]

**12.** However, Caudle testified that he thought that they were cancelling all three of the panels. [Caudle Dep. pp. 70–71.] He subse-

quently learned that it was only the Homosexuality and Religion panel that Korzdorfer wanted cancelled. *Id.* Caudle said that he had misunderstood Korzdorfer's proposal and that when he realized that Korzdorfer only wanted to cancel the one panel, he said "we can't do that." *Id.* In his opinion, he thought that the best thing to do at the time was to cancel all three panels. *Id.* at 71.

sued. However, I support and believe in your vision of the religion discussion. Let me know how I can more fully show my support.

Sunnie

*Id.*

Unable to persuade Sunnie Korzdorfer to reinstate the Homosexuality and Religion panel and to allow the GSA to run it as planned, Parker Pennington and Rodney Mancini requested a meeting with Principal Caudle. [Pennington Dep., p. 112.] [13] Caudle acquiesced and convened a meeting at the end of the day on Friday, March 15, 2002, i.e., the last school day prior to the commencement of Diversity Week 2002. Present at this meeting were Caudle, Korzdorfer, Class Principal Lara Erickson, Equity Ombudsman Eaddy–Richardson, Parker Pennington, Rodney Mancini, and Pioneers for Christ advisors Bill Johnson and James Brink. (Prior to this meeting, Dr. George Fornero, who was at the time acting superintendent, told Equity Ombudsman Eaddy–Richardson that the Homosexuality and Religion panel would not be canceled. [*See* Eaddy–Richardson Dep., pp. 68–70.] Fornero, however, offered no explanation for the decision to reinstate the panel. *Id.* at 70.)

During the March 15, 2002 meeting, it was made known that Betsy Hansen wanted a representative on the Homosexuality and Religion panel to express her religious view. [Pennington Dep., p. 119.] Pennington testified that he protested that Plaintiff's view "would be negative or water down the view that the GSA was trying to convey" with the panel. *Id.*[14] *See also* Korzdorfer Dep., p. 93. Despite the advocacy of her PFC advisors, ultimately, it was decided that neither Betsy nor any representative who would express Betsy's religious view would be permitted to speak on the panel. [*See* Bill Johnson Dep., pp. 85–90.] The reason given for denying Betsy representation on the Homosexuality and Religion panel was that she did not follow proper procedure, i.e., she did not attend the first "mandatory" meeting on February 22nd. [*See* Korzdorfer Dep., 90–105.] However, no mention was made of Betsy having been absent from school on that date.[15]

At this March 15 meeting, the Pioneers for Christ were made an offer, in lieu of having a representative to express their particular religious view on the Homosexuality and Religion panel, the option of having a panel of their own. [Eaddy–Richardson Dep., pp. 81, 83; Erickson Dep., pp. 60, 72; Pennington Dep., pp. 120–21.] PFC advisors Johnson and Brink, however, declined the offer because of insufficient time to organize a panel discussion with Diversity Week starting on the very next school day, Monday, March 18th. *Id.*

The Homosexuality and Religion panel went forward without Betsy or her representative. As indicated, six pro-homosexu-

---

**13.** Rodney Mancini testified that he also contacted the ACLU to look into the issue of whether the GSA had a legal right to deny Pioneers for Christ representation on the panel, and that he told Ms. Eaddy–Richardson that he did so. [Mancini Dep., p. 119.] According to Mancini, the ACLU told him that they did not have to have the PFC on their panel and he so informed Eaddy–Richardson. *Id.* at 120.

**14.** Pennington gave a statement to the PHS student newspaper that "allowing adults hostile to homosexuality on the panel would be like inviting white supremacists on a race panel." *See* Pennington Dep. Ex. 3.

**15.** Sunnie Korzdorfer, however, was unable to affirmatively state that if Betsy had been at that first meeting she would have been permitted to be on the Homosexuality and Religion panel. *See* Korzdorfer Dep., pp. 104–105 ("I would have had to have asked the GSA and Parker and Rodney. . . ." *Id.* at 105.)

al adult clergy and religious leaders were presenters. None of the clergy and religious leaders was Roman Catholic nor shared the Roman Catholic beliefs regarding homosexuality. [See Jeremy O'Brien Dep., pp. 59–62.] Some of the clergy woke clerical garb during the panel. [Rev. Susan McGarry Dep., pp. 69–70; Rev. John Nieman Dep., pp. 41–42.] The panel members were held out as experts on matters of religion. [Pennington Dep., pp. 88–89 and Dep. Exs. 1 and 10.]

The format of the panel was one of question-and-answer and was moderated by Defendant Pennington. Questions were pre-submitted by students, and Defendant Pennington decided which ones he would ask. [Pennington Dep., p. 94–95.]

Panelists discussed the Bible and Sacred Scripture, explaining how passages referring to homosexuality had been misunderstood or mistranslated by others to mean that homosexuality was immoral or sinful or incompatible with Christianity. [See McGarry Dep., pp. 79–80; Hansen Dep., pp. 187–89.] One of the panelists suggested that students read a book entitled, *Rescuing the Bible from Fundamentalism*, in order to get a better understanding of what Sacred Scripture meant, particularly with regard to homosexuality. [See Kirsten Raab Dep., pp. 97–98; Hansen Dep. p. 187; McGarry Dep., pp. 95–96.]

Defendants did not seek parental advice or consent prior to holding the Homosexuality and Religion panel, nor did Defendants provide information to parents about the form and content of the event prior to holding it. [See Korzdorfer Dep., pp. 121–123; Caudle Dep., pp. 42–46. See also Constance Hansen Decl., Plaintiff's Ex. 25,

¶ 10; Ralph Martine Decl., Plaintiff's Ex. 29, ¶ 3.]

### KORZDORFER OFFERS BETSY THE OPPORTUNITY TO GIVE A SPEECH AT THE DIVERSITY WEEK OPENING GENERAL ASSEMBLY

On March 13, 2002, the Wednesday before the start of Diversity Week 2002, Sunnie Korzdorfer offered Betsy Hansen an opportunity to give a two-minute speech at the March 18 General Assembly. [See Hansen Dep., p. 109; Korzdorfer Dep., pp. 130–131.] Ms. Korzdorfer testified that she chose Betsy as one of three students to make a speech on "what diversity means to me" as "an offer of good will," because she knew that Betsy was upset about the Homosexuality and Religion panel. *Id.*[16] Betsy accepted Korzdorfer's offer.

Prior to delivering her speech, Betsy was required to submit it to Korzdorfer to review. Korzdorfer reviewed it then passed it along to Lara Erickson for review. Erickson, in turn, took the speech to Principal Caudle. Caudle and Erickson did not approve of all of the speech's content. [Korzdorfer Dep., pp. 142–45; Erickson Dep., pp. 87–89.] The objectionable content was as follows:

> One thing I don't like about Diversity Week is the way that racial diversity, religious diversity, and sexual diversity are lumped together and compared as if they are the same things. Race is not strictly an idea. It is something you are born with; something that doesn't change throughout your life, unless your [sic] Michael Jackson, but that's a special case. It involves no choice or action. On the other hand, your religion is your

---

**16.** Betsy similarly viewed Korzdorfer's offer. She wrote in her diary on March 13 regarding having been offered the opportunity to give a two-minute speech by Ms. Korzdorfer: "I'm pretty surprised that they asked me. The only thing Ms. K knows about me is that I wanted bring in my own priests, et cetera, for the sexual orientation panel. Maybe she offered me the speaking opportunity because she felt bad that the panel I was involved with got cancelled." [Hansen Dep., p. 109.]

choice. Sexuality implies an action, and there are people who have been straight, then gay, then straight again. I completely and whole-heartedly support racial diversity, but I can't accept religious and sexual ideas or actions that are wrong.

Although nothing in Betsy's speech was vulgar, offensively lewd, or contained profanity, according to Defendants Korzdorfer and Erickson, this speech was objectionable because it targeted an individual and groups, specifically homosexuals. [Korzdorfer Dep., p. 140, 147–48; Erickson Dep., p. 88.] Erickson highlighted specific portions of the speech and Defendant Korzdorfer called Betsy at her home on the Sunday prior to the Assembly (i.e., Sunday, March 17) to "suggest" that she make the changes in the speech. Korzdorfer Dep., p. 140.[17] Betsy did not want to change her speech but felt she had no choice; school policy states that it is "inappropriate behavior" for a student to "[r]efus[e] to comply either verbally or nonverbally, with a direction or instruction of a staff member." [Caudle Dep., pp. 27–28.] Although Korzdorfer reviewed the other two speakers' speeches, she did not give them to Ms. Erickson or Mr. Caudle to review, and neither of these speakers was required to change their speeches.

## III. *PLAINTIFFS' COMPLAINT*

On July 10, 2002, Elizabeth Hansen and her mother, Constance Hansen instituted this action for declaratory and injunctive relief and damages against the Ann Arbor Public Schools, Henry Caudle, Lara Erickson, Sunnie Korzdorfer, Parker Pennington IV, Rodney Mancini and Denise Eaddy–Richardson pursuant to 42 U.S.C. §§ 1983 and 1988. By an amended complaint filed on February 20, 2003, Ralph Martin was added as a party-plaintiff. In their First Amended Complaint, Plaintiffs allege claims of deprivation of their First Amendment rights to freedom of speech and free exercise of religion; violation of the Equal Protection clause of the Fourteenth Amendment, and violation of the Establishment Clause of the First Amendment.[18] Constance Hansen and Ralph Martin further allege infringement of their parental rights to the care, custody, education of and association with their children in violation of the First and Fourteenth Amendments.

This matter is now before the Court on the parties' cross-motions for summary judgment. Having completed extensive discovery, the parties have agreed that there are no material factual disputes and that the case may be decided on the law presented by the cross-motions. Having reviewed and considered the parties' briefs and supporting evidence, and having heard the oral arguments of counsel on November 24, 2003, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## IV. *DISCUSSION*

### A. *DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH*

The First Amendment of the Constitution declares that "Congress shall make no law ... abridging the freedom of speech." U.S. Const., amend I. When an individual speaks, the government's ability to regu-

---

**17.** The full text of the speech that Betsy wanted to give is appended to Defendants' Brief in Support of their Motion for Summary Judgment at Ex. D. The text of the speech that she actually gave (which was revised as directed by Ms. Korzdorfer) is appended at Ex. E.

**18.** Plaintiffs also allege three separate claims of "conspiracy" charging Defendants with conspiring to deprive Elizabeth Hansen of her rights to freedom of speech, free exercise of religion and equal protection.

late that speech depends, in some situations, on the designation of the forum in which the individual chooses to speak. *See e.g., Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Here, the speech at issue occurred in a public high school.

*CATEGORIES OF SPEECH WITHIN THE SCHOOL SETTING*

■ There are three primary categories of speech that occur within the school setting. Student speech that "happens to occur on the school premises," is governed by *Tinker v. Des Moines Ind. Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Pure student speech, such as the black armbands worn by the students protesting the Vietnam War in *Tinker* or the tee-shirts worn by the students in *Castorina v. Madison County School Bd.,* 246 F.3d 536 (6th cir. 2001), and *Barber v. Dearborn Public Schools,* 286 F.Supp.2d 847 (E.D.Mich. 2003), must be tolerated by the school "unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'" *Hazelwood,* 484 U.S. at 266, 108 S.Ct. at 566 (quoting *Tinker,* 393 U.S. at 509, 89 S.Ct. at 738).

■ At the other end of the spectrum is "government speech", such as the principal speaking at a school assembly. When the government itself is the speaker, it may make viewpoint-based choices and choose what to say and what not to say. *See Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995);

*Downs v. Los Angeles Unified Sch. Dist.,* 228 F.3d 1003, 1013 (9th Cir.2000) ("[W]hen a public high school is the speaker, its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis, but instead is measured by practical considerations applicable to any individual's choice of how to convey oneself: among other things, content, timing, and purpose.")

■ Between pure student speech and government speech is "school-sponsored" speech, which is governed by *Hazelwood Sch. Dist. v. Kuhlmeier, supra.* School-sponsored speech is student speech that a school "affirmatively...promote[s]," as opposed to speech that it "tolerate[e]s." *Hazelwood,* 484 U.S. at 270–71, 108 S.Ct. 562. "Expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute "school-sponsored" speech over which the school may exercise editorial control so long as its actions in doing so "are reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273, 108 S.Ct. 562.

■ Plaintiffs argue that the speech at issue here should be treated as student speech governed by *Tinker.* Defendants counter that the disputed speech should be categorized as either government speech or "school sponsored"/*Hazelwood* speech.[19]

Plaintiffs argue for application of the *Tinker* standard contending that because it was the students' "personal message" of opposition to the war in Vietnam expressed by their wearing of black armbands that *Tinker* protected, so too, should the same standard be used to afford First Amendment protection to Betsy Hansen's

---

**19.** Interestingly, in their Brief in Support of their Motion for Summary Judgment, Defendants argued that the speech at issue constituted "school sponsored" speech, but, in their Response to Plaintiffs' Motion for Summary Judgment and at oral argument, they argued that it was "government speech."

"personal message" of "what diversity means to *me*." Plaintiffs similarly argue that *Tinker* should apply in assessing the schools' denial of representation of Betsy's viewpoint on the Homosexuality and Religion panel relying upon the *Tinker* Court's broad pronouncement that public school students "may not be confined to the expression of those sentiments that are officially approved." 393 U.S. at 511, 89 S.Ct. 733. In making their arguments, however, Plaintiffs ignore the distinct context of Betsy's school assembly speech and the Homosexuality and Religion panel—neither the assembly nor the panel constituted personal expression that just "happen[ed] to occur on the school premises." Instead, the Diversity Week speaking events at issue were specifically and particularly planned by student groups with their faculty advisors and were approved by school administration—they did not just "happen to occur" in the school, but rather occurred at school-sponsored forums.

But, neither is the speech here "government speech," as argued by Defendants. In support of their argument that the Homosexuality and Religion panel constitutes "government speech," Defendants rely principally on *Downs v. Los Angeles Unified Sch. Dist., supra. Downs,* however, is factually quite distinct.

At issue in *Downs* was a school's refusal to permit an individual teacher to post anti-homosexuality materials in response to the Los Angeles Unified School District's "Gay and Lesbian Awareness Month" posters and materials which were provided by the central office to schools within the district and posted on a school bulletin board which, pursuant to actual practice and policy, was under the direct control and oversight of the school principal. Because it was the school district itself that provided the Gay and Lesbian Awareness Month posters and materials to the high school, and because they were posted on a bulletin board that was under the direct control and oversight of the school principal, the court found that the "speaker" of the bulletin board was the school itself—an arm of local government. And, because the government itself was speaking, the court concluded that the case fell within the government speech rules which allowed it to impose viewpoint-based restrictions. The *Downs* court explained:

> This case is not controlled by *Hazelwood* or *Planned Parenthood* [*v. Clark County Sch. Dist.*, 941 F.2d 817 (9th Cir. 1991)] because it is a case of the government itself speaking, whether the government is characterized as Leichman High, LAUSD, or the school board. It is not a case involving the risk that a private individual's private speech might simply "bear the imprimatur" of the school or be perceived by outside individuals as "school sponsored."

> \*　　\*　　\*　　\*　　\*　　\*

> An arm of local government—such as a school board—may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives.

941 F.2d at 1011, 1014.[20]

Here, by contrast, it was clearly not the school itself speaking at the general assembly about "what diversity means to me" or at the Homosexuality and Religion panel. Indeed, not a single school administrator or teacher conveyed any viewpoint or message at either forum. At the general assembly, it was students—not any

---

**20.** One cannot help but wonder if the Ninth Circuit would have been so categorical in ceding to the school unbridled authority to make viewpoint-based speech if the case in question had presented the school speaking on the other side of the issue.

teacher or administrator—who spoke on "what diversity means to me." Similarly, clergymen from outside the school presented their respective congregations' views on homosexuality at the Homosexuality and Religion panel. In fact, the record evidence indicates that it was precisely because of their position as religious clergy that they were invited to participate on the panel. It is, therefore, clear to the Court that this speech was not "government speech" but rather was speech that might simply "bear the imprimatur" of the school or be perceived by outside individuals as "school sponsored" by virtue of it having occurred at a school-sponsored forum. Therefore, it is governed by *Hazelwood.*

The Sixth Circuit case of *Poling v. Murphy,* 872 F.2d 757, 761 (6th Cir.1989), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 723, 107 L.Ed.2d 742 (1990), is illustrative of the circumstances which render speech in a school setting "school sponsored" speech. In *Poling,* the Sixth Circuit found that a "campaign" speech made by a public high school student who was running for student council president at a school assembly constituted "school-sponsored" speech within the meaning of *Hazelwood.* In that case, school officials scheduled the assembly to be held during school hours and on school property, made attendance compulsory for everyone, determined the eligibility of prospective speakers, and vetted the candidates' speeches in advance.

Like the student council assembly in *Poling,* the Diversity Week 2002 general assembly and panel discussions were held during school hours and on school property, and presentations were made by people who were neither teachers nor school administrators. Further, as in *Poling,* school officials determined the eligibility of the speakers and with respect to the general assembly they also vetted the "What Diversity Means to Me" speeches before they were given. Therefore, it is the *Ha-*

*zelwood* standards that are applicable in analyzing Plaintiffs' freedom of speech claim in this case.

*HAZELWOOD*

 *Hazelwood* involved a high school principal's decision to delete two pages from a school newspaper which contained two stories: one described three Hazelwood students' experiences with pregnancy and the other discussed the impact of divorce on students at the school which identified by name a particular student and her mother and father and contained negative statements concerning the student's parents. The school newspaper was written and edited by the Journalism II class at Hazelwood East High School. The practice at Hazelwood was for the journalism teacher to submit page proofs for each issue of the school newspaper to the principal for review prior to publication. The principal was concerned that, although the pregnancy story used false names in an attempt to keep the girls' identities secret, because very few students at the school were pregnant, he believed that the girls could still be identified from the text.

It was because of his concern about invading the privacy rights of the students mentioned and the parents named in the divorce story that the principal ordered the two pages containing the pregnancy and divorce stories deleted. Three Hazelwood students who were on the school newspaper staff subsequently brought suit alleging that the principal, the journalism teacher and various other school officials violated their First Amendment rights by deleting the two pages of articles from the newspaper.

The Supreme Court first rejected the students' argument that the school newspaper constituted a public forum such that they had an unfettered right to say whatever they wanted to say in whatever manner they chose. Rather, just as the Court

had found in *Tinker,* the *Hazelwood* court reaffirmed that the school setting presents a "nonpublic forum" 484 U.S. at 270, 108 S.Ct. at 569. The Court then proceeded, however, to reject application of the *Tinker* standard, explaining:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Id.* at 270–71, 108 S.Ct. at 569–570.

The Court then delineated a standard to be applied to such "school sponsored" speech:

> ... [W]e conclude that the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, *we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to pedagogical concerns.*

*Id.* at 271–72, 108 S.Ct. at 570–71 (emphasis added).

Applying this new standard, the Court concluded that Principal Robert Reynolds acted reasonably in requiring the deletion of the pregnancy and divorce articles. The Court reasoned:

> The initial paragraph of the pregnancy article declared that "[a]ll names have been changed to keep the identity of these girls a secret." The principal concluded that the students' anonymity was not adequately protected, however, given the other identifying information in the article and the small number of pregnant students at the school. Indeed, a teacher at the school credibly testified that she could positively identify at least one of the girls and possibly all three. It is likely that many students at Hazelwood East would have been at least as successful in identifying the girls. Reynolds therefore could reasonably have feared that the article violated whatever pledge of anonymity had been given to the pregnant students. In addition, he could reasonably have been concerned that the article was not sufficiently sensitive to the privacy interests of the students' boyfriends and parents who were discussed in the article but who were given no opportunity to consent to its publication or to offer a response. . . .
>
> The student who was quoted by name in the version of the divorce article seen by Principal Reynolds made comments sharply critical of her father. The principal could reasonably have concluded that an individual publicly identified as an inattentive parent—. . . was entitled to the opportunity to defend himself as a matter of journalistic fairness. . . .
>
> In sum, we cannot reject as unreasonable Principal Reynolds' conclusion that

neither the pregnancy article nor the divorce article was suitable for publication in *Spectrum*. Reynolds could reasonably have concluded that the students who had written and edited these articles had not sufficiently mastered those portions of the Journalism II curriculum that pertained to the treatment of controversial issues and personal attacks, the need to protect the privacy of individuals whose most intimate concerns are to be revealed in the newspaper, and the legal, moral and ethical restrictions imposed upon journalists within a school community that includes adolescent subjects and readers.... Accordingly, no violation of First Amendment rights occurred.

*Id.* at 274–276, 108 S.Ct. at 571–572 (citations and some internal punctuation omitted).

Therefore, under *Hazelwood*, Defendants here were certainly entitled to some degree of editorial control over the school-supervised programs so long as their actions in exercising that control were reasonably related to legitimate pedagogical concerns.

Defendants maintain that four pedagogical concerns animated their actions regarding Betsy Hansen's speech and her requests regarding the Homosexuality and Religion panel: (1) teaching students to stay on topic; (2) teaching students to follow proper procedures; (3) making students aware of minority points of view; and (4) creating a safe and supportive environment for gay and lesbian students. Defendants argue that because their actions with respect to Betsy's general assembly speech and her request to have a representative on the Homosexuality and Religion panel to communicate her message were motivated by legitimate pedagogical concerns, the rule of *Hazelwood*

dictates that Plaintiffs' freedom of speech claim must fail.

However, putting aside for the moment the legitimacy of Defendants' proffered pedagogical concerns, Defendants overlook the fact that even under *Hazelwood*, a school does not have a completely unfettered right to restrict speech. A school's restrictions on speech reasonably related to legitimate pedagogical concerns must still be viewpoint-neutral. *See, Searcey v. Harris*, 888 F.2d 1314, 1319, 1325 (11th Cir.1989) (finding no indication in *Hazelwood* that the Supreme Court "intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views" and holding that school officials are required "to make decisions relating to speech which are viewpoint neutral"); *Planned Parenthood v. Clark County Sch. Dist.*, 941 F.2d 817, 829 (9th Cir.1991) (finding that the "reasonableness" required to justify school authorities to regulate speech under *Hazelwood* requires viewpoint neutrality and holding that school district was viewpoint neutral in prohibiting advertisements of birth control products in school-sponsored publications); *Downs v. Los Angeles Unified Sch. Dist.*, *supra*, 228 F.3d at 1011 (court noted that if it were presented with a case of school-sponsored speech, it would be compelled, pursuant to *Hazelwood* and *Planned Parenthood*, to review the school district's actions restricting speech "through a viewpoint neutrality microscope," but finding that the speech posted on the school bulletin board was government speech not "school sponsored" speech, and therefore, not governed by *Hazelwood* ); *Kincaid v. Gibson*, 191 F.3d 719, 727 (6th Cir.1999) (noting that under *Hazelwood* "school officials may impose any reasonable, non-viewpoint-based restriction on student speech") [21], *rev'd and*

---

**21.** *See also* Judge Boggs' separate opinion, concurring in part and dissenting in part, in

*remanded on other grounds*, 236 F.3d 342 (6th Cir.2001) (en banc).[22] *But see Fleming v. Jefferson County Sch. Dist.*, 298 F.3d 918 (10th Cir.2002) ("[W]e conclude that *Hazelwood* allows educators to make viewpoint-based decisions about school-sponsored speech.")[23]

Although *Hazelwood* itself does not specifically mention viewpoint neutrality, it is implicit in the Court's holding. As indicated above, it was because of Principal Reynolds concern about invading the privacy rights of the students mentioned and the parents named in the divorce story that the principal ordered the two pages containing the pregnancy and divorce stories deleted. The record evidence in *Hazelwood* established that the principal did not oppose the discussion of the topics in the school newspaper. *See Kuhlmeier v. Hazelwood School Dist.*, 607 F.Supp. 1450, 1466 (E.D.Mo.1985). *See also Castorina ex rel. Rewt v. Madison County School Bd.*, 246 F.3d 536, 542–43 (6th Cir.2001)

the *Kincaid en banc* decision:

> There was evidence that administrators were disturbed by the viewpoint that they perceived as being expressed. I am therefore not prepared to say that there may not have been viewpoint discrimination which is illegitimate even in a nonpublic forum. 236 F.3d at 358–59.

**22.** *Kincaid* involved Kentucky State University's decision to withhold from dissemination the university's student yearbook ostensibly because university administrators found the publication to be of poor quality and "inappropriate." Two university students subsequently brought suit alleging that the university's confiscation and failure to distribute the yearbook violated the First Amendment. The district court and the original appellate panel in *Kincaid* determined that, for purposes of First Amendment analysis, the KSU yearbook, constituted a nonpublic forum and, therefore, applied *Hazelwood*. The en banc court, however, determined that the yearbook constituted a limited public forum, not a nonpublic forum, and therefore, found *Hazelwood* to be inapplicable. 236 F.3d at 346 and n. 5.

Although the Sixth Circuit's ultimate holding in *Kincaid* did not involve an indepth analysis of the requisites of *Hazelwood*, as the Court observed at the hearing on this matter, and as Defendants' counsel conceded, *Kincaid* gives us an indication that, were it today squarely faces with the issue of restrictions on speech permitted under *Hazelwood*, the Sixth Circuit would hold that a school's restriction on speech, even if related to legitimate pedagogical concerns, must be "viewpoint neutral."

**23.** The reasoning of *Fleming* is flawed. In *Fleming*, Columbine High School officials censored students' painting of tiles which were part of a project intended to make students feel more comfortable with their surroundings in the aftermath of the 1999 killings of 12 students and teachers by two CHS students. The Tenth Circuit determined that *Hazelwood* did not require viewpoint neutrality when educators made decisions about school-sponsored speech. Although it noted that the Sixth, Ninth, and Eleventh Circuits had all determined that *Hazelwood* required viewpoint neutrality, the *Fleming* court held that viewpoint neutrality is not required. In reaching that conclusion, the *Fleming* court relied upon two decisions from the First and Third Circuits, *Ward v. Hickey*, 996 F.2d 448 (1st Cir.1993), and *C.H. ex rel Z.H. v. Oliva*, 195 F.3d 167, 172–73 (3d Cir.1999), *aff'd in relevant part (without explanation) and vacated and remanded in part*, 226 F.3d 198 (3d Cir. 2000) (en banc). However, *Fleming*'s reliance on these two decisions is wholly misplaced because in both *Ward* and *C.H.*, the speech involved was government speech, not "school-sponsored" speech. Indeed, even the portion of *C.H.* quoted in *Fleming* makes that clear: "[T]he requirement of viewpoint neutrality, while essential to the analysis of a school's restrictions on extracurricular speech... is simply not applicable to restrictions on the State's own speech...." 298 F.3d at 927, quoting *C.H.*, 195 F.3d at 173 (citations omitted). Similarly, *Ward* dealt with regulation of teacher speech in the classroom. In *Ward*, the First Circuit determined that a school district had an unfettered right to decide what the curriculum of the school would be and in that context, was entitled to decide that abortion would not be part of the ninth grade biology curriculum.

(explaining that in *Hazelwood,* "[t]he pregnancy story was rejected because the principal feared that in spite of the pseudonyms used in the article, the subjects might still be identified by the school community. The divorce story was rejected because it contained negative information about school parents and there was insufficient time to permit them to respond to the facts set out in the article.")

As the Eleventh Circuit explained in *Searcey v. Harris, supra,*

> The Board argues that *Hazelwood* does not prohibit school officials from engaging in viewpoint discrimination. We disagree.... There was no indication that the principal [in *Hazelwood* ] was motivated by a disagreement with the views expressed in the articles. Although *Hazelwood* provides reasons for allowing a school official to discriminate based on *content,* we do not believe it offers any justification for allowing educators to discriminate based on viewpoint. The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis. *See e.g., Cornelius [v. NAACP Legal Defense Fund,* 473 U.S. 788, 812–813, 105 S.Ct. 3439].... Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral.

888 F.2d at 1324–25 (citations omitted).

Indeed, it is evident from post-*Hazelwood* decisions that the Supreme Court itself construes *Hazelwood* as prohibiting viewpoint-based restrictions on "school-sponsored" speech. For example, in *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), the Court held that a university's denial of funding for the printing costs for a student newspaper with a Christian editorial viewpoint amounted to unconstitutional viewpoint discrimination. There the Court stated:

> [T]he University relies on our assurance in *Widmar v. Vincent,* [454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ]. There, in the course of striking down a public university's exclusion of religious groups from use of school facilities made available to all other student groups we stated: "Nor do we question the right of the University to make academic judgments as to how best allocate scarce resources." 454 U.S., at 276, 102 S.Ct., at 277. The quoted language in *Widmar* was but a proper recognition of the principle that when the State is the speaker, it may make content-based choices.

> \* \* \* \* \* \*

> ***It does not follow, however, and we did not suggest in Widmar, that viewpoint based restrictions are proper when the University itself does not speak*** or subsidize transmittal of a message it favors.... A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles.

515 U.S. at 833–34, 115 S.Ct. at 2518–19 (citing *Board of Ed. of Westside Community Schools (Dist.66) v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) and *Hazelwood School Dist. v. Kuhlmeier, supra.*) [24]

**24.** Defendants contend that *Rosenberger* should be distinguished on the facts because in that case, it was the university's expenditure of funds that was at issue. However, as the Court observed at the hearing on this matter, one could argue that when the government gives its backing to a panel for which it has provided the forum, as in *Rosenberger,* it is deciding how to use its resources.

Turning, then, to the facts in this case, it is clear to the Court that Defendants' decision to restrict Betsy Hansen's speech, both with respect to her "What Diversity Means to Me" speech and the exclusion of the PFC viewpoint from the Homosexuality and Religion panel, was far from viewpoint-neutral. Rather, the record makes clear that Defendants' actions were predominantly motivated by their disagreement with Betsy's and the PFC's message.

First, with regard Betsy's general assembly speech, despite the personal and subjective topic, "What Diversity Means to Me," Defendants censored Betsy's speech, finding objectionable that portion of her speech in which she expressed that she could not accept sexual orientation or religious teachings that she believes are wrong. It was because Defendants sought to suppress this view that they directed Betsy to remove the offending content.

Defendants' decision to deny Betsy and the PFC representation on the Homosexuality and Religion panel was similarly motivated by their disagreement with Betsy's viewpoint. Both Parker Pennington and Sunnie Korzdorfer testified that after it was determined by administration on March 12 that Betsy should be allowed to have representation on the panel, Pennington pressed for keeping Betsy off the panel because Betsy's message "would be negative or water down the view that the GSA was trying to convey" with the panel. *Id.* See also Korzdorfer Dep. p. 93. Pennington even gave a statement to the PHS student newspaper that "allowing adults hostile to homosexuality on the panel would be like inviting white supremacists on a race panel." *See* Pennington Dep. Ex. 3. Even after being told (by Eaddy–Richardson) that Betsy had a legal right to express her viewpoint on the panel, Korzdorfer continued to support Pennington and the GSA's desire to keep her off the panel. She e-mailed Pennington advising

him that she had been informed by a GSA leader that he did not want Pioneers for Christ to be able to put a member on the panel saying that homosexuality is not valid, and told Pennington, "*I supported his view and I still do* .... I support and believe in your vision of the religion discussion." Korzdorfer Dep. Ex. 25.

Furthermore, a close examination of Defendants' own description of their purported "legitimate pedagogical concerns" belies any attempt to justify their actions as "viewpoint neutral." Defendants maintain that the legitimate pedagogical objectives advanced by their actions in restricting Betsy's speech included teaching students to stay on topic, making students aware of minority points of view, creating a safe and supportive environment for gay and lesbian students. According to Defendants, each of these pedagogical concerns is, "legitimate" by "accepted standards of educational theory and practice." [*See* Defendants' Brief in Support of their Motion for Summary Judgment, p. 11.] Yet, in explaining how each of these goals were furthered by restricting Betsy's speech, it is not educational theory or practice that Defendants rely upon, but rather it is their specific disapproval of the message that Betsy would have conveyed that underlies their decision. *See id.,* pp. 11–13.

For example, Defendants maintain that their censorship of Betsy's speech and precluding her from participating on the Homosexuality and Religion panel was reasonable in light of their legitimate pedagogical concern that Betsy be taught "to stay on topic." Defendants argue

"The theme of Diversity Week, including the all-school assemblies, was *Celebrating* Diversity at PHS." The topic of the panel...was that homosexuality and religion were not incompatible. ***Quite simply, Betsy's speech which targeted homosexuals for a negative message,***

**801**

*and her proposal to have a panelist stating that homosexuality was sinful, did not adhere to the theme, topic, or format of these events.*

Defendants' Brief at p. 11. In addition, Korzdorfer's e-mail to Parker Pennington, the GSA advisor, makes clear that when the administration first believed it was legally obligated to allow Betsy's viewpoint to be presented, the Defendants' initial response was to simply cancel the panel. The foregoing demonstrates that it was Betsy's anticipated viewpoint that motivated Defendants, not any pedagogical concern. Perhaps more importantly, however, the transparency of Defendants' argument is made apparent by the deposition testimony of Pioneer High School Principal Caudle, who candidly testified that it would *not* have been consistent with the theme of Diversity Week to have only one religious viewpoint expressed on the Homosexuality and Religion panel. Principal Henry Caudle testified as follows:

> Q: . . . [W]hat is your understanding of the purpose and goal of the Diversity Week events? And, talking from . . . a learning objective, you're an educator, what is the learning objective of Diversity Week at Pioneer High School? . . . A [by Mr. Caudle]: Well, as I said before, *the overall objective is to teach young people that there are differences that should be celebrated,* because we are different doesn't mean that there has to be strife or discor[d] and that we can work together, should work togeth-

er . . . and is something we should celebrate.

Pioneer High School is very diverse, and that's a good thing. And we are just trying to help students to understand that they should feel fortunate to be in such an environment where then can learn from others who are different, we look different, we think differently, and we're just trying to set a comfortable environment for that to take place. Q: *With that objective in mind, would it be consistent with that objective . . . with that theme to have one particular religious view expressed during the Homosexuality and Religion panel?* . . .

A: *No.*

Caudle Dep. pp. 84–85.[25]

Defendants also argue that their actions furthered the pedagogical objective of promoting "student tolerance and acceptance of minority points of view." They state that this legitimate pedagogical concern was furthered by censoring Betsy's speech and denying her representation on the panel *because faculty in this case believed that Betsy's speech as originally written and her desire to have a panel member state her view were inconsistent* with the goal of promoting tolerance for minority view points. *Id.* at 12. That Defendants can say with apparent sincerity that they were advancing the goal of promoting "acceptance and tolerance for minority points of view" by their demonstrated *in*tolerance for a viewpoint that was not consistent with their own is hardly

---

**25.** After a brief recess in his deposition (during which Principal Caudle apparently discussed his testimony with his lawyer), Mr. Caudle attempted to retreat from his admission that having only one viewpoint on the panel was not consistent with the theme and objective of Diversity Week. He asked the examiner whether they could revisit the question regarding the overall goals of Diversity

Week and the Homosexuality and Religion panel. He then told the examiner "I wasn't sure what you were getting at" when he asked him whether having only one religious viewpoint on the panel would be consistent with the theme of the panel and that he "probably should have said 'I don't know or '[I] don't understand' '' instead of answering the question. [See Caudle Dep., pp. 103–105.]

worthy of serious comment. Suffice it to say that inherent in this rationale is the premise that the PFC view of homosexuality as a religious sin is not a minority view, or at least not a minority view which should be tolerated. It strikes the Court that neither of these premises are pedagogical concerns, but rather are political, cultural or religious, or all three.

Defendants further claim that their actions were motivated by a commitment "to provide a safe and supportive environment for gay and lesbian students." *Id.* at 12–13. They claim that they would be frustrated in their goal if they were to allow Betsy or a religious cleric to deliver a message that was not supportive of gays. However, Defendants fail to show why gays would be threatened or be made less "safe" by allowing the expression of an opposing viewpoint, particularly when the panel included six clerics presenting the opposite view. Furthermore, the testimony of the PHS administrators was that there had been no reports, surveys, or complaints about harassment or victimization because of a student's sexual orientation. *See* Deposition of Superintendent George Fornero, pp. 54–57. (Mr. Fornero is the former principal of PHS.). *See also* Eaddy–Richardson Dep. pp. 17–21.[26]

With respect to Defendants' fourth educational goal—to teach students to follow procedures—the Court finds that this purported legitimate pedagogical concern is wholly pretextual in this case. Indeed, the court is left to wonder what message concerning intellectual integrity the school is conveying to students by making an argument that is so transparently disingenuous and offensive in its Procrustean attempt to torture the facts *ex post facto* to justify its ultimate decision.

Defendants claim that they expected Betsy to follow proper procedures with respect to the Homosexuality and Religion panel, and because she did not attend all mandatory meetings and did not provide Ms. Korzdorfer with a list of names of the persons she wanted on the panel, they were justified in not allowing her to have a representative on the panel. However, the record evidence establishes that attendance at the first "mandatory" meeting was not, in fact, mandatory for everyone—there were students who did not attend the first meeting who were allowed participation on other panels. Indeed, it was specifically because the first "mandatory" meeting was so sparsely attended, that a second "mandatory" meeting was scheduled—which Ms. Hansen did attend. Furthermore, Tom Jensen testified that it was accepted practice if a student was absent from school on the day of a mandatory meeting—as Betsy was on February 22, 2002—he or she was not precluded from participating so long as they had someone else attend to inform the student council advisor that they wanted to be on a panel. Kirsten Raab attended the first mandatory meeting and, at Betsy Hansen's request, Kirsten told Ms. Korzdorfer that Betsy wanted to be on the Homosexuality and Religion panel. Indeed, Ms. Korzdorfer testified that she could not affirmatively say that if Betsy had been at the first mandatory meeting she would have been allowed representation on the panel. And, with respect to not providing Korzdorfer with a list of names, Ms. Korzdorfer ad-

---

**26.** Eaddy–Richardson testified that, during the 2001–2002 school year, she had had one informal, outside-of-school conversation with one lesbian "split" student (i.e., attended both Community High and Pioneer High) who complained about the school "climate" and related some incidents of name-calling and being pushed into the lockers. However, Ms. Eaddy–Richardson testified that most of these incidents happened prior to the 2001/2002 school year and the student did not specify that the alleged incidents occurred at PHS. [Eaddy–Richardson Dep. pp. 22–25.]

mitted at her deposition that she never gave Betsy a deadline for doing so and never followed up on the issue because she made the decision to cancel the panel shortly after her conversation with Betsy concerning the names. It was only after the panel was reinstated that the decision to exclude Betsy from the panel was made. Therefore, Betsy never had an opportunity to submit names of panelists.[27]

It is clear from the foregoing that, notwithstanding their pronouncement that they were motivated by "legitimate pedagogical concerns," Defendants' actions were, in fact, motivated by their disagreement with Betsy's message and that their decisions restricting Betsy Hansen's speech and excluding her viewpoint from the Homosexuality and Religion panel were not "viewpoint neutral." In fact, the record is quite clear that Defendants' motivation was precisely the opposite: to insure that only one viewpoint was presented by the panel.

The danger in this is quite evident, and it is a danger that would jeopardize the rights of not only PFC members, but equally (and perhaps, more so) the rights of gays, lesbians and other groups. As the Court pointed out at oral argument, if schools are permitted to stifle opposing viewpoints in the manner done here, what is to prevent school administrators in other districts where there are, perhaps groups strongly rooted in the community who are opposed to gay rights on religious (or other) grounds from holding a school forum on homosexuality and religion and refusing to permit a more gay-friendly message to be presented. And, of course, the same may be said about other politically- or religiously-charged issues. The point, of course, is that, no matter how well-intentioned the stated objective, once schools get into the business of actively promoting one political or religious viewpoint over another, there is no end to the mischief that can be done in the name of good intentions.

For all of the foregoing reasons, the Court finds that Betsy Hansen's First Amendment right to freedom of speech was violated by the actions of Defendants.

## B. DEFENDANTS VIOLATED THE FIRST AMENDMENT'S ESTABLISHMENT CLAUSE

▇▇ Plaintiffs also claim that by establishing a panel of clergy who presented only one religious viewpoint regarding ho-

---

**27.** Defendants also make the argument that notwithstanding their decision to deny Betsy and the PFC the right to have a representative on the Homosexuality and Religion panel, they were afforded an equal opportunity to present their message by way of the school allowing "milk crate preaching" at lunchtime outside the school and by offering the PFC on March 16, 2002 the opportunity to have its own panel. As the Court indicated at the hearing on this matter, neither of these alternatives constitutionally suffices to excuse Defendants' refusal to allow PFC representation on the Homosexuality and Religion panel. First, with respect to the "milk crate preaching," the whole purpose of the panel, as Defendants' counsel conceded at oral argument, was to invest the panel with the authority and greater expertise of a formal panel with perceived religious leaders and Biblical scholars leading the discussion. A student speaking from a milk crate outside of the school during lunch hour can hardly be said to place the student's message on equal footing with clerics and Biblical scholars speaking to a captive audience of students during a school-sponsored forum. With respect to the "offer" to the PFC to put on its own panel during Diversity Week, the Court views this as pyrrhic. The offer was made to the PFC sponsors at the end of the school day on Friday, March 16, 2002. Diversity Week began the following Monday, thereby giving the PFC only the weekend to assemble panelists and decide upon a program. The GSA, by contrast, had more than two months to plan and assemble its Homosexuality and Religion panel. For these reasons, the Court finds no merit in Defendants' arguments based upon the "milk crate preaching" and separate panel offer.

mosexuality, Defendants also violated the Establishment Clause.

The Establishment Clause of the First Amendment to the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion...." Neutrality is the fundamental requirement of the Establishment Clause, which prohibits the government from either endorsing a particular religion or promoting religion generally. *See Cutter v. Wilkinson,* 349 F.3d 257 (6th Cir.2003); *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("[A] principle at the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion."); *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Gillette v. United States,* 401 U.S. 437, 450, 91 S.Ct. 828, 836, 28 L.Ed.2d 168 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes to favor the adherents of any sect or religious organization.")

The Supreme Court has been particularly vigilant in monitoring the compliance with the Establishment Clause in elementary and secondary schools. *See Edwards v. Aguillard,* 482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987); *see also Coles v. Cleveland Bd. of Educ.,* 171 F.3d 369, 377 (6th Cir.1999) ("The Supreme Court's Establishment Clause jurisprudence has been remarkably consistent in sustaining virtually every challenge to government-sponsored religious expres-

sion or involvement in the public schools."); *Doe v. Beaumont Ind. Sch. Dist.,* 240 F.3d 462, 487 (5th Cir.2001) (noting that the Establishment Clause must be applied "with special sensitivity" in a public school setting). The *Edwards* Court explained the reason for its vigilance:

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

482 U.S. at 584, 107 S.Ct. at 2577. *See also, People of Illinois ex rel. McCollum v. Bd. of Educ. of School Dist. No. 71,* 333 U.S. 203, 216–17, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring) (where Justice Frankfurter referred to the unique role of the public school as "perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people," requiring the public school to "keep scrupulously free from entanglement in the strife of sects.") It is against these concerns that Defendants' actions in this case must be evaluated. *See Edwards, supra; Coles v. Cleveland Bd. of Ed., supra.*

In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court articulated a three-part test to determine whether a statute violates the Establishment Clause.[28] In order to pass muster under the *Lemon* test, the government's action must satisfy three criteria: (1) the government's action must have a secular purpose; (2) its principal and pri-

---

**28.** Although the Supreme Court has articulated other tests in certain particular contexts (*e.g.,* the "endorsement" test, *see Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) and the "coercion" test, *see Lee v. Weisman,* 505 U.S. 577, 112 S.Ct.

2649, 120 L.Ed.2d 467 (1992)), the Sixth Circuit expressly has determined that, other than in aid-to-education cases, the rule that this Circuit will adhere to is the traditional *Lemon* analysis. *See Cutter v. Wilkinson, supra.*

mary effect must be one that neither advances nor inhibits religion; and (3) it must not foster excessive government entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111.

*Lemon* requires first that the government action at issue serve a "secular legislative purpose." *Id.,* at 612, 91 S.Ct., at 2111. However, the requirement of a secular purpose "does not mean that the government's purpose must be unrelated to religion." *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987); *Cutter v. Wilkinson, supra.* Rather, *Lemon*'s "purpose" requirement "aims at preventing the relevant governmental decisionmaker from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Amos, supra; Cutter, supra.* While the government's characterization of its purpose is entitled to deference, "it is the duty of the courts to distinguish a sham secular purpose from a sincere one." *Santa Fe Ind. Sch. Dist. v. Doe,* 530 U.S. 290, 307, 120 S.Ct. 2266, 2278, 147 L.Ed.2d 295 (2000).

Defendants maintain that the Homosexuality and Religion panel had a secular purpose: "to inform students that some religious congregations are open and affirming of gays, in order to promote and endorse tolerance of a minority viewpoint." *See* Brief in Support of Defendants' Motion for Summary Judgment, p. 16. However, when a state-sponsored activity has an overtly religious character, courts have consistently rejected efforts to assert a secular purpose for that activity. *See Mel-*

*len v. Bunting,* 327 F.3d 355, 373 (4th Cir.2003).

In this case, it is cannot be denied that the Homosexuality and Religion panel had "overtly religious character." The panel was made up entirely of clergy and religious leaders from religious institutions that were hand-selected by Defendants specifically because of their particular religious beliefs. Some panelists wore their religious garb. The panelists were expected to and, in fact did, discuss the Bible and other religious documents, and interpreted specific Biblical passages to show that homosexuality is not condemned in the Bible. Because of its overtly religious character, the Court rejects Defendants' characterization of the purpose of the Homosexuality and Religion panel as secular.

However, even assuming *arguendo* that the purpose of the Homosexuality and Religion panel was secular in nature, it still fails *Lemon*'s second prong. The second prong of the *Lemon* test requires an examination of the "primary effect" of the challenged action. "This primary effect prong must be assessed objectively, in order to measure whether the principal effect of government action is to suggest government preference for a particular religious view, or for religion in general." *Mellen, supra,* 327 F.3d at 375.

Defendants here were quite candid in admitting that the panel was created to convey only one religious view regarding the issue of homosexuality. Any contrary or differing religious view was deemed "negative," and summarily excluded from the panel. Clearly, the principal effect of the panel was to suggest preference for a particular religious view.[29]

---

**29.** As discussed at oral argument, even if more than one religious view were conveyed by the panel (e.g., if the PFC had been permitted to have a representative on the panel), the Homosexuality and Religion panel may still have failed to pass muster under the *Lemon* test because the panel would still have shown

a preference for religion in general. *See Mellen, supra,* 327 F.3d at 375; *Cutter, supra* (the Establishment Clause prohibits government not only from endorsing a particular religion but also from promoting religion generally.) *See also, Edwards v. Aguillard,* 482 U.S. 578,

Finally, with regard to *Lemon*'s "excessive entanglement" prong, the Supreme Court has held that the question of entanglement is essentially one of "kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Weighing the "kind and degree" of the school district's involvement in the process of selecting a student speaker and in reviewing the pre-football game invocation message that would be delivered by the speaker, the Court found "excessive entanglement" with religion in *Santa Fe Ind. Sch. Dist. v. Doe*, 530 U.S. 290, 301, 120 S.Ct. 2266, 2275, 147 L.Ed.2d 295 (2000). Although no clergy were involved at all in the *Santa Fe* case, focusing on the ability of the school administrators to regulate the content and topic of the invocation-format speech that would be delivered, the Court found excessive entanglement. *Id.* at 2276. *See also Adler v. Duval Cty. Sch. Bd.*, 250 F.3d 1330, 1337 (11th cir.2001) ("[t]he ability to regulate the content of speech is a hallmark of state involvement."); *see also Coles v. Cleveland Bd. of Education*, 171 F.3d 369, 385 (6th Cir. 1999) (finding excessive entanglement where a school board decided to include a prayer in its public meetings and chose which member from the local religious community would give those prayers).

The foregoing demonstrates that Defendants' level of involvement in this case in selecting the clergy for the panel, vetting the religious beliefs of the chosen clergy, recruiting the clergy, and providing school facilities and a captive audience of students for the clergy, and censoring and editing Betsy Hansen's speech based on its religious viewpoint, constitutes the kind of "excessive entanglement with religion"

found by the Supreme Court to be constitutionally impermissible.

For all of the foregoing reasons, the Court finds that Defendants' presentation of the Homosexuality and Religion panel during Diversity Week 2002 violated the Establishment Clause of the First Amendment.

## C. DEFENDANTS HAVE VIOLATED THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

■ Section 1 of the Fourteenth Amendment provides, in pertinent part: "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To establish a violation of the Equal Protection Clause, it must first be shown that the defendants' actions result in similarly-situated individuals receiving disparate treatment. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Gillard v. Norris*, 857 F.2d 1095, 1100 (6th Cir.1988). If it is shown that similarly-situated persons receive disparate treatment, and if that disparate treatment invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard governs, and the defendant's actions will be sustained only when they are narrowly tailored to a serve a compelling government interest. *See Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *37712, Inc. v. Ohio Dept. of Liquor Control*, 113 F.3d 614, 621 (6th Cir.1997) (quoting *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249).

---

107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (requiring the teaching of two religious viewpoints—creationism and evolution—in the public schools' science curriculum did not save state statute from the proscriptions of the

Establishment Clause). However, because the PFC was not permitted to have its view presented, the Court need not decide this issue here.

As shown above, Defendants in this case discriminated against Betsy Hansen on the basis of both message and religion, denying her the right to deliver her message while at the same time affording the GSA the right to deliver its own religious message. Such discrimination is violative of the Equal Protection Clause.

As the Court explained with respect to the First Amendment's protection of freedom of speech in *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972):

> Under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. *Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.*

*Id.*, 408 U.S. at 96, 92 S.Ct. at 2290 (emphasis added).

The same tenet holds true with respect to the Religion Clauses:

> Just as we subject to the most exacting scrutiny laws that make classifications based on race... so too we strictly scrutinize governmental classifications based on religion.

*Employment Div. Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 886, n. 3, 110 S.Ct. 1595, 1604, n. 3, 108 L.Ed.2d 876 (1990). *See also, Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, supra* (O'Connor, J. concurring):

> This emphasis on equal treatment is, I think, an eminently sound approach. In my view, the Religion Clauses—the Free Exercise Clause, the Establishment Clause, the Religious Test Clause, Art. VI, cl 3 and the Equal Protection Clause as applied to religion—all speak with one voice: *Absent the most unusual circumstances, one's religion ought not to affect one's legal rights or duties or benefits.*

512 U.S. at 714, 114 S.Ct. at 2497 (emphasis added).

As discussed above, because fundamental constitutional rights of free speech and religion are involved, the "strict scrutiny" standard governs. Therefore, Defendants' actions will be sustained under the Equal Protection Clause only if they have established that their actions were narrowly tailored to a serve a compelling government interest. Defendants have not even attempted to make any such showing that their decisions to censor Betsy's "What Diversity Means to Me" speech and to deny Betsy Hansen the right to participate on the Homosexuality and Religion panel were "narrowly tailored to serve a compelling government interest." Rather, they simply deny any violation of any fundamental rights. Such a bare denial is patently insufficient to pass constitutional muster.[30]

D. *PLAINTIFFS HAVE FAILED TO ESTABLISH A VIOLATION OF THEIR FIRST AMENDMENT FREE EXERCISE RIGHTS*

■ The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free*

---

30. As they have done with respect to all of Plaintiffs' substantive constitutional claims, Defendants also argue for dismissal of Plaintiffs' conspiracy claims solely by arguing that no violation of Plaintiffs' constitutional rights have been violated.

*exercise thereof . . . .*" The contours of the Free Exercise Clause were succinctly summarized by the Supreme Court in *Employment Div., Dept. of Human Resources of Ore. v. Smith,* 494 U.S. 872, 878, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990):

> The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all governmental regulation of religious *beliefs* as such. The government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

*Smith,* 494 U.S. at 877–78, 110 S.Ct. 1595 (citations omitted).

The gravamen of a free exercise claim, thus, is that the government forces one to do something contrary to one's religion, or presents one with a Hobson's choice between forsaking one's religion or suffering serious negative consequences. *See, e.g. Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (Jehovah's Witnesses' free exercise claim predicated upon their being required to build tanks for the military or forego unemployment benefits after quitting). However, absent a showing that the plaintiff was required to affirm or deny a belief or engage (or refrain from engaging) in a practice prohibited (or mandated) by his or her religion, no claim for violation of free exercise rights will be sustained. *See Mozert v. Hawkins Cty. Bd. of Educ.,* 827 F.2d 1058, 1065 (6th Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988).

In *Mozert,* fundamentalist Christian students and their parents challenged the use of a basic reader in the public schools because it included stories dealing with mental telepathy and supernaturalism which they claim contravened their religious beliefs. Because there was no evidence that the students were required to affirm or deny their religious beliefs nor were they compelled to engage in any practices prohibited by their religion, the court dismissed the plaintiffs' free exercise claim. 827 F.2d at 1065.

As in *Mozert,* in this case, there is no evidence that Betsy Hansen was ever required by Defendants to "affirm or deny a belief" or that she was forced to "engage in a practice" prohibited by her religion. Nor has Betsy shown that she was compelled to accept the viewpoint espoused by the panelists on the Homosexuality and Religion panel. To the contrary, although she was not allowed to have her viewpoint represented on the panel, she was allowed to, and did, in fact, submit questions to the panelists and these questions showed in no uncertain terms that she disagreed with their viewpoint. Moreover, both Betsy and Maureen Martin testified in their depositions that their views regarding homosexuality did not change as a result of the panel. (Maureen Martin further testified that she did not feel as though the panelists were trying to "convert" her.) There being no evidence of compulsion by Defendants, Plaintiffs' free exercise claim fails.

Plaintiffs, however, attempt to make out their claim by asserting that Betsy had a moral obligation to defend her faith against opposing views, and that Defendants violated her right to free exercise by preventing her from doing so because, during the Homosexuality and Religion panel presentation, no comments from the audience were allowed. She claims that because no comments from the audience were permitted, she was precluded from defending the view of her Roman Catholic faith that homosexuality is a sin.[31] Howev-

---

**31.** Plaintiffs' expert, Fr. Michael Orsi, testified in his deposition that, as a Catholic, Betsy had

er, Betsy makes no claim that the "no comments from the audience" rule was adopted because of her religion. Nor does she claim that the rule was only applied to Roman Catholics or members of the PFC. Rather, the record establishes that the rule was applied to all members of the audience, regardless of their religion or religious views. Parker Pennington, who moderated the panel, testified that the "no comments from the audience" rule was adopted because of time constraints. The panelists had only 50 minutes to present their entire program. Pennington testified, "If we had all day to do this, there would be an opportunity to—for follow up... but otherwise one question could have taken up the entire panel time if you allowed follow-ups and threads and tangents." [Pennington Dep., p. 110.] Clearly, the preclusion of comments from the audience had nothing to do with Betsy's or anyone else's religion.

The Supreme Court has consistently held that rights of free exercise do not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *See e.g., Employment Div., Dept. of Human Resources of Ore. v. Smith, supra,* 494 U.S. at 879, 110 S.Ct. at 1600 (free exercise rights of plaintiffs held not violated by the State's denial of unemployment compensation benefits to them on misconduct grounds due to their dismissal from their drug counseling positions resulting from their sacramental use of peyote at a Native American church ceremony since the ingestion of peyote was

an obligation to confront any "error" of religious teaching, such as the "error" presented by the Homosexuality and Religion panelists

illegal under Oregon criminal laws of general application). *See also, Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (mother's prosecution for violation of child labor law for using her children to dispense religious literature on the street held *not to violate mother's free exercise rights,* the mother's religious motivation notwithstanding, because the law merely precluded the children "from doing what no other children may do.").

Here, all students in the audience were precluded from commenting at the Homosexuality and Religion panel. Betsy was merely precluded from doing what no other student could do.

As Justice Frankfurter stated in *Minersville School Dist. v. Gobitis,* 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940):

Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.

310 U.S. at 594–95, 60 S.Ct. at 1012–13 (footnote omitted).

The foregoing demonstrates that Plaintiffs' free exercise claim based upon Betsy Hansen having been precluded from speaking out at the Homosexuality and Religion panel to oppose the panelists' "error" of religious teaching is without legal merit. Accordingly, the Court will enter summary judgment in Defendants' favor on this claim.

regarding homosexuality. [*See* Fr. Orsi Dep., Defendants' Ex. A–11, pp. 50–56.]

E. *CONSTANCE HANSEN AND RALPH MARTIN HAVE FAILED TO ESTABLISH AN INTRUSION OF CONSTITUTIONAL MAGNITUDE ON THEIR RIGHT, AS PARENTS, TO CONTROL THE RELIGIOUS UPBRINGING AND EDUCATION OF THEIR CHILDREN*

■ Plaintiffs Constance Hansen and Ralph Martin claim that by endorsing or promoting the view that homosexuality is compatible with religion and by conveying a message of disapproval of the traditional Christian belief that homosexual activity is immoral and sinful, Defendants have infringed upon their rights as parents to control the religious upbringing and education of their children. [Plaintiffs' Amended Compl., ¶ 51.] To the extent that Mrs. Hansen and Mr. Martin have presented this claim as a claim entirely separate and distinct from the speech, religion and equal protection claims of Betsy Hansen, the Court finds that in the context presented in this case, no such separate parental rights claim will lie.

The Fourteenth Amendment's Due Process Clause includes a substantive component that "provides heightened protection against government interferences with certain fundamental rights and liberty interests." *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (quoting *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). One of the "fundamental liberty interests" recognized by the Supreme Court is the "interest of parents to make decisions concerning the care, custody, and control of their children." *Troxel, supra,* 530 U.S. at 65–66, 120 S.Ct. 2054; *see also Meyer v. Nebraska,* 262 U.S. 390, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (recognizing that the liberty interest protected by due process includes the right of parents "to control the education of their own"); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ("the liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (recognizing that there is a constitutional interest in parents directing the "custody, care and nurture of the child."); *Newdow v. U.S. Congress,* 328 F.3d 466 484 (9th Cir.2003), *cert. granted in part,* —— U.S. ——, 124 S.Ct. 384, 157 L.Ed.2d 274 (2003) (parents have a right to direct the religious upbringing of their children).

■ The genesis of the right claimed here is the Supreme Court's 1923 decision in *Meyer v. Nebraska, supra.* In *Meyer,* the Court struck down a state law forbidding instruction in certain foreign languages in part because it arbitrarily interfered with the "right of parents" to procure such instruction for their children. 262 U.S. at 400, 43 S.Ct. at 627. Two years later, in *Pierce v. Society of Sisters, supra,* the Court struck down a state statute requiring public school attendance—and thus precluding attendance at parochial schools—because it "unreasonably interefer[d] with the liberty of parents or guardians to direct the upbringing and education of children under their control." 268 U.S. at 534–35, 45 S.Ct. at 573–74.

In the Court's most recent decision, *Troxel v. Granville, supra,* the Court found unconstitutional a state court's application of Washington's nonparental visitation statute, finding that the statute as applied by the state court to permit the petitioner's children's grandparents unrestricted visitation rights based solely upon the court's unsupported conclusion that such visitation would be "in the best interests of the children" unconstitutionally infringed upon "the fundamental right of parents to make decisions concerning the

care, custody, and control of their children." 530 U.S. at 65, 120 S.Ct. at 2060.

Although, as the cases make clear, the Supreme Court has recognized that the right of a parent to control a child's upbringing and education is "fundamental," the Court has never been called upon address the contours of this right or the level of judicial scrutiny required where schools make curricular decisions that arguably infringe on such parental rights. However, two federal circuit courts—the First and the Second Circuits—have specifically done so, and the Court finds their decisions instructive.

In *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir.1995), the parents of two high school students complained that the officials of a public school district violated their parental rights to direct the upbringing of their children and to educate in accord with their own views of morality. At issue in *Brown* was a mandatory school AIDS awareness assembly during which the presenters used sexually explicit language and performed sexually explicit skits with several minors selected from the audience. According to the plaintiffs' complaint, during this school assembly, presenters also advocated and approved oral sex, masturbation, homosexual sexual activity and premarital sex. 68 F.3d at 529.

In addressing the parents' parental rights claim, the *Brown* court examined the historical context and development of the "fundamental" parental right to direct the upbringing and education of children and concluded that, in the context of curricular choices made by public school officials, the rights of parents as established by the Supreme Court in *Meyer, Pierce* and their progeny, are not implicated. The court reasoned:

> The *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language. That is, the state does not have the power to "standardize its children" or "foster a homogeneous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education. We do not think, however, that this freedom encompasses a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children. We think it is fundamentally different for the state to say to a parent, "You can't teach your child German or send him to a parochial school," than for the parent to say to the state, "You can't teach my child subjects that are morally offensive to me." the first instance involves the state proscribing parents from educating their children, while the second involves parents prescribing what the state shall teach their children. If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to cater a curriculum for each student whose parents had genuine moral disagreements with the school's choice of subject matter. We cannot see that the Constitution imposes such a burden on state educational systems, and accordingly find that the rights of parents as described by *Meyer* and *Pierce* do not encompass a broad-based right to restrict the flow of information in the public schools.

*Id.* at 533–34 (internal citations omitted).

In *Leebaert v. Harrington*, 332 F.3d 134 (2nd Cir.2003), the Second Circuit similarly held that a parent's claim of violation of parental rights was subject only to a rational-basis level of scrutiny, notwithstanding that it was coupled with a free exercise claim. There, the basis of the parent's claim was a state's requirement that public

schools include in their health education component teaching about alcohol, tobacco, drugs and sex. Mr. Leebaert objected to his seventh grade son being taught such matters, specifically tying his own religious and moral values to his objections:

> My objection... is that I believe that God has empowered human beings with the right to bring their children up with correct moral principles in dealing with the issues taught in this course, not the school system. I claim the right, and responsibility, to impart those religious values which I have been taught to my children to develop their moral, ethical and religious character.

332 F.3d at 137.

The Second Circuit, like the First Circuit, rejected Mr. Leebaert's parental rights claim:

> Meyer, Pierce, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught. As the Brown and Swanson[32] courts correctly perceived, recognition of such a fundamental right—requiring a public school to establish that a course of instruction objected to by a parent was narrowly tailored to meet a compelling state interest before the school could employ it with respect to the parent's child—would make it difficult or impossible for any public school authority to administer school curricula responsive to the overall educational needs of the community and its children.

Id. at 140 (footnote added).[33]

The Leebaert court also rejected the plaintiff-parent's attempt to analogize his claim to that of the plaintiffs in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In Yoder, the Supreme Court invalidated Wisconsin's compulsory high-school attendance law under the Free Exercise Clause in response to Amish parents' objections. In so doing, the Court held that "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." Id. at 233, 92 S.Ct. 1526.

Leebaert argued that his claim, based on the interests of parenthood combined with a free exercise claim, was analogous to that of the Amish parents in Yoder. However, as the Second Circuit observed,

---

**32.** Swanson v. Guthrie Ind. Sch. Dist. No. I–L, 135 F.3d 694 (10th Cir.1998). In Swanson, the Tenth Circuit held that a public school's policy against part-time attendance did not implicate parents' constitutional right to direct their children's education. Id. at 702.

**33.** The Leebaert court acknowledged that the Supreme Court, in dicta in Employment Division, Dept. of Human Resources of Ore. v. Smith, supra, distinguished the facts under review in that free exercise case from potential cases that might involve the Free Exercise Clause in conjunction with other constitutional protections, Smith at 882, 110 S.Ct. 1595, stating that "[t]he present case does not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity or parental right." Id. The Court, thus, implied at least that such "hybrid situations" combining a free exercise claim with a parental rights claim, for example, might merit a higher standard than rational basis review. However, because the Smith statement was dicta, the Second Circuit declined to apply some stricter standard of review to Leebaert's parental rights claim.

The Sixth Circuit has also rejected a more stringent legal standard for hybrid claims involving free exercise and various other constitutional claims, albeit not in the parental rights context. See Kissinger v. Board of Trustees of the Ohio State University, College of Veterinary Medicine, 5 F.3d 177 (6th Cir. 1993).

the *Yoder* Court took pains explicitly to limit its holding to "a free exercise claim of the nature revealed by this record," *id.*, "one that probably few other religious groups or sects could make," *id.* at 236, 92 S.Ct. 1526. It was based upon a history of three centuries as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society, that the Amish convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others. *Id.* at 235, 92 S.Ct. 1526. This threat to the Amish community's way of life, posed by a compulsory school attendance statute, was central to the holding in *Yoder.*

Because the threat to the Amish community's way of life posed by Wisconsin's compulsory education statute was central to the holding in *Yoder,* the Second Circuit found Leebaert's claim to be qualitatively distinguishable from that case:

> We have no reason to doubt either Leebaert's sincerity or the depth of his convictions. But because of the comparative breadth of the plaintiffs' claim in *Yoder,* we do not think that Leebaert's free exercise claim is governed by that decision: He has not alleged that his community's entire way of life is threatened by Corky's participation in the mandatory health curriculum. Leebaert does not assert that there is an irreconcilable *Yoder*-like clash between the essence of Leebaert's religious culture and the mandatory health curriculum that he challenges. Leebaert asserts that the

mandatory health curriculum conflicts with his belief that "drugs and tobacco are [not] proper subjects that I want my son's school to teach" and his view that "sex before marriage is . ... something I do not want my sons to be involved in." Leebaert Aff. dated May 22, 2000, at ¶¶ 5–6. Leebaert's free exercise claim is [thus] qualitatively distinguishable from that alleged in *Yoder.*

332 F.3d at 144.[34]

Here, the Court similarly finds that Mrs. Hansen's and Mr. Martin's parental rights claim in this case do not rise to the level of the plaintiffs' claims in *Yoder* such that heightened scrutiny is warranted. It can hardly be said that a 50–minute panel discussion—which students could opt-out of if they so chose—equates with a "*Yoder*-like clash" between the essence of a religious culture of an entire community and the beliefs espoused by the panelists which are challenged here. Applying a rational-basis level of scrutiny, then, this Court agrees with the First Circuit: If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to fashion a separate curriculum for each student whose parents had genuine religious or moral disagreements with the school's choice of subject matter. The Court does not believe that the framers of our Constitution intended to impose such a burden on this nation's public schools.

Therefore, to the extent that Mrs. Hansen and Mr. Martin have framed their parental rights claim as separate and distinct from Betsy Hansen's core constitutional claims, the Court will enter summary judgment in favor of Defendants on this claim.

---

**34.** *See also Brown, supra* where the First Circuit distinguishing the free exercise claims arising from the plaintiffs' children's one-time compulsory attendance at a ninety-minute AIDS awareness program from those asserted in *Yoder.*

814

## F. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

 The individual Defendants have also argued that they are immune from liability on Plaintiffs' claims by application of the doctrine of qualified immunity, The Sixth Circuit has summarized the law of qualified immunity as follows:

> Qualified immunity is a defense that is available to government officials performing discretionary functions. By operation of that doctrine, government officials generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Accordingly, any objectively reasonable action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be insulated by qualified immunity. Thus, even if a public officer has deprived the plaintiff of a federal right, qualified immunity will apply if an objectively reasonable official would not have understood, by referencing clearly established law, that his conduct was unlawful.

*Hamilton v. Myers*, 281 F.3d 520, 531–32 (6th Cir.2002) (citations and internal punctuation omitted).

Defendants make only the less-than-helpful argument that "no one could contend that the rights claimed by Plaintiffs are 'clearly established.'" [*See* Brief in support of Defendants' previously filed motion to dismiss (which was dismissed by the Court without prejudice upon the filing of Plaintiffs' First Amended Complaint), Defendants' Ex. I, incorporated by reference in their Brief in Support of Motion for Summary Judgment. p. 20, n. 25]. As the authorities cited above in this Opinion and Order demonstrate, there can be no serious question that the Free Speech and Freedom of Religion constitutional rights asserted by Plaintiffs are very clearly established fundamental rights, and that the contours of these rights were the subject of well-known and well-developed law at the time Defendants acted. Thus, the only question is whether, measured by an objective reasonableness standard, Defendants should have understood that their conduct was unlawful.

Defendants can hardly claim that a reasonable education official in their position would not have understood that their actions were unlawful when they themselves were expressly informed at the March 12, 2002 meeting by Equity Ombudsman Eaddy–Richardson, who was a licensed attorney, that Betsy had a legal right to have her view represented on the Homosexuality and Religion panel. *See* Korzdorfer Dep. Ex. 25. *See also,* Johnson Dep., pp. 69–70. For confirmation of this, the Court need look no further than Ms. Korzdorfer's own statements and Defendants' own conduct. First, Korzdorfer's e-mail to Parker Pennington summarized the March 12, 2002 meeting with Principal Caudle, Class principal Erickson, Eaddy–Richardson, and PFC advisor Bill Johnson:

> The crux of the meeting was this: Pio's for Christ have a leagal [sic] right to be on the panel. It does not matter that the panel's intent is to show how religion and sexuality can go hand in hand. They have a leagal [sic] right to say that homosexuality [sic] is not a valid lifestyle. That is the bottom line.

Further, once Defendants had been informed at the March 12 meeting of PFC's right to be on the panel, Defendants response was, as Korzdorfer explained in her e-mail, to cancel the panel. This conduct clearly acknowledges the Defendants' awareness that PFC had a right to participate on the panel, as Korzdorfer cited this right as the only reason for canceling the panel. Given their belief in the PFC's

legal right to representation on the panel, Defendants had three fairly obvious options: (1) include a PFC representative on the panel; (2) cancel the panel, as they initially did, and stand by their decision; or (3) at the very least, seek a formal legal opinion from another attorney to obtain a definitive determination as to whether they were required to include a PFC representative on the panel. (Of course, this last option may well have resulted in an opinion they did not want, i.e., that PFC did have a right to be represented on the panel.)

Instead, Defendants chose a fourth option: to reinstate the panel and exclude the PFC, knowing well that they might be sued. *See* Korzdorfer Dep. Ex. 25 (explaining to Parker Pennington her decision to cancel the panel rather than include a PFC representative on the panel, Korzdorfer stated, "I am treading on shallow ground here, as I do not want to be sued.")

Whatever may be said about the wisdom of this decision, it certainly cannot be said that it was made without Defendants' knowledge of Plaintiffs' legal rights and the potential liability to which the decision would subject them. Having knowingly taken that risk, Defendants can now not be credibly heard to deny their knowledge of Plaintiffs' legal rights.

For these reasons, the Court finds that Defendants are not entitled to qualified immunity in this case.

## CONCLUSION

For all of the reasons stated above in this Opinion and Order, the Court finds that Defendants' actions with respect to Betsy Hansen during Diversity Week 2002 violated Plaintiffs' First Amendment right to freedom of speech and further violated the Establishment Clause of the First Amendment. The Court further finds that by their actions, Defendants denied Betsy Hansen her constitutional right to equal protection. The Court, however, finds no violation of the Free Exercise Clause and no violation of Constance Hansen's and Ralph Martin's parental rights to control the religious upbringing and education of their children. Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is granted in part, and denied in part. Plaintiffs' Motion is granted with respect to their free speech, establishment clause, and equal protection claims but denied with respect to their free exercise and parental rights claims.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is granted in part, and denied in part. Defendants' Motion is granted with respect to Plaintiffs' free exercise and parental rights claims, but is denied with respect to their free speech, establishment clause, and equal protection claims.

Because Plaintiffs have indicated to the Court that they are seeking only nominal damages,

IT IS FURTHER ORDERED that Plaintiffs shall file with the Court and serve upon Defendants, their claim for damages and a verified statement of any fees and/or costs which they seek pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988. Defendants shall have the right to object to any such fees and costs as provided in the applicable statutes and court rules.